# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TQ DELTA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 14-cv-954-RGA |
| | ) | |
| v. | ) | **FILED UNDER SEAL** |
| | ) | |
| ADTRAN, INC., | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |
| | ) | |

| | | |
|---|---|---|
| ADTRAN, INC., | ) | |
| | ) | |
| Plaintiff and | ) | C.A. No. 15-cv-121-RGA |
| Counterclaim Defendant, | ) | |
| | ) | **FILED UNDER SEAL** |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| TQ DELTA, LLC, | ) | |
| | ) | |
| Defendant and | ) | |
| Counterclaim Plaintiff. | ) | |

### PLAINTIFF TQ DELTA'S OPPOSITION TO DEFENDANT ADTRAN INC.'S OBJECTIONS TO THE SPECIAL MASTER'S MARCH 30, 2018 ORDER

Dated: April 30, 2018

Peter J. McAndrews (admitted *pro hac vice*)
Timothy J. Malloy (admitted *pro hac vice*)
Thomas J. Wimbiscus (admitted *pro hac vice*)
Sharon A. Hwang (admitted *pro hac vice*)
Paul W. McAndrews (admitted *pro hac vice*)
Anna M. Targowska (admitted *pro hac vice*)
MCANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, Illinois 60661
(312) 775-8000
(312) 775-8100 (Fax)
pmcandrews@mcandrews-ip.com

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, Delaware 19801
(302) 777-0300
(302) 777-0301 (Fax)
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Counsel for Plaintiff TQ Delta, LLC*

**I.      INTRODUCTION**

ADTRAN, Inc. ("ADTRAN") has failed to show that the Special Master's order is erroneous. The Special Master received thorough briefing, patiently heard over three hours of oral argument, and issued a well-reasoned order.  ADTRAN is left to make vague and unsupported arguments that, for example, "litigation funding" is for some unstated reason relevant to "damages" theories.  This is perplexing, as the matter has no connection whatsoever to any Georgia-Pacific factor or anything else relevant to the issue of damages.  Nor has ADTRAN shown how "litigation funding" is somehow relevant (or proportional) to any issue in this case.  Likewise, ADTRAN has failed to show why TQ Delta, LLC ("TQ Delta") should be forced to scour the company to cobble together documents "sufficient to show" any relationship with any entity that meets an unspecified definition of "affiliates" or other entities –and who has no control over TQ Delta's business.  These requests are but a fishing expedition to improperly glean insight regarding TQ Delta financing and financial resources, shareholders, and collateral litigation or other matters—none of which is relevant to any issue in this case.  TQ Delta had agreed to produce documents sufficient to show the only entity involved in management of TQ Delta—and documents showing any interest in this case by any potential inventor witnesses. Finally, the Court should rule as it has done twice before, and reject ADTRAN's last minute attempt to sweep in settlement negotiations with third parties under the guise of the Order's directive to produce representations of value, infringement or validity in the context of litigation funding.

**II.     ARGUMENT**

    **A.     The Special Master Correctly Ruled That Documents Relating to Litigation Financing are Objectionable**

Request 111 seeks "agreements related in any way to TQ Delta's financing of the present

1

litigation." Request No. 56 seeks "communications relating to agreements and drafts of agreements entered into between TQ Delta and any nonparty relating to, in whole or in part, the Asserted Patents." TQ Delta objected to these requests on the basis of, among other things, relevance, undue burden, overly broad, and lack of proportionality. These requests encompassed draft settlement agreements, but ADTRAN has conceded that such scope was objectionable by focusing only on "litigation funding agreements" here. *See ADTRAN's* Motion at 3-6.

**Bias.** ADTRAN has failed to show that any alleged financial interest of investors is relevant to any claim or defense, let alone proportional to the needs of the case. ADTRAN argues that it should know of any alleged bias of litigation funders. But, ADTRAN's reasoning is backwards. The identity of any litigation financing party is simply irrelevant (and unfairly prejudicial in as much as ADTRAN may seek to harass anyone with such an interest by third party discovery). ADTRAN has made no showing that the testimony of any litigation financing party is relevant or proportional to the needs of the case. Thus, whether any such party has an "interest" in this action is likewise irrelevant. Moreover, TQ Delta had already agreed to provide any agreements regarding any inventor fact witness who might have any interest in this case. And, just as in any case, ADTRAN is free to ask any witness about matters of bias. The Special Master properly rejected ADTRAN's effort to improperly glean insight into TQ Delta financial resources, shareholders, and collateral litigation.

**Real Party in Interest.** Although ADTRAN pays lip service to such an assertion in two sentences (D.I. 372, Objections at 2), there is no question of the real party in interest in this case. ADTRAN ignores that the only relevant "relationship" between any so-called "related entity" is the relationship between TQ Delta and any party with the right to control TQ Delta, namely its Manager TQCAP GP, LLC. In this regard, TQ Delta produced its Limited Liability Company

2

Agreement which states REDACTED

. See Appendix, *Plantiff's Response To Adtran's Jan. 22, 2018 Discovery Letter*, at A2-3 ("Plaintiff's Response"). There is thus no basis for any assertion that other entities have any right to control TQ Delta.

Further, the patent purchase agreement between TQ Delta and Aware (which TQ Delta has produced) confirms that there is no basis upon which to allege that TQ Delta does not possess <u>all</u> substantial <u>rights</u> in the asserted patents. ADTRAN simply ignores the matter. The Federal Circuit has "observed that (1) the exclusive right to make, use, and sell ... is vitally important, and (2) <u>the nature and scope of the patentee's retained right to sue accused infringers and license the patent are the most important factors in determining whether</u> **an agreement** . . . <u>transfers sufficient rights to render the other party the owner of the patent</u>." *Diamond Coating Techs., LLC v. Hyundai Motor America*, 823 F.3d 615, 619 (Fed. Cir. 2016) (quotations omitted)(emphasis added).

**Lack of Relevance, Good Cause & Basis**. In the Order, the Special Master correctly found that ADTRAN had failed to show any basis for this request:

> At a fundamental level, the requesting party must put forth good cause or a basis for the discovery request. *See Novanta Corp.*, 2016 WL 4987110, at *2. While the Civil Rules' emphasis on proportionality adds another layer to the analysis, the requesting party must first show that it is entitled to the requested information. *See id.* The Court finds that Adtran has not made the initial showing [for] litigation financing agreements.

Order at 10. The Special Master also correctly rejected ADTRAN's peculiar argument that the agreements are relevant to evaluate the basis of the "proportionality" objection. (If financial

well-being could negate one's proportionality objections, then large, well-funded parties such as ADTRAN would never have a basis for such an objection.) The Special Master reasoned that ADTRAN's position was not supported—and he also found that ADTRAN's reasoning was contrary to this Court's ruling in *Acceleration Bay LLC v. Activision Blizzard, Inc., et al.*, C.A. Nos. 16-453-RGA, 16-454-RGA, 16-455-RGA (D. Del. Feb. 9, 2018):

> Adtran, rather, argues that the production of such agreements is relevant to evaluating TQ Delta's objections to discovery on the basis of proportionality. While Civil Rule 26 lists the parties' respective resources as a factor in the Court's analysis, it is one of at least six factors set forth in Civil Rule 26(b), and the Court does not find that it is the determinative factor in the analysis. Further, Adtran's reliance on Judge Andrews' rulings in *Acceleration Bay, LLC* and *MoCa II* for this specific point is misplaced. Neither case stands for the proposition that a party must produce a litigation financing agreement. *See Acceleration Bay, LLC v. Activision Blizzard, Inc.* Judge Andrews, in fact, explained:
>
>> And I don't think the entities that are providing the funding, or the amount of the funding are relevant, or likely to lead to relevant information. And what's more, I think they are – I think really they should be off limits unless they are really necessary, and I don't think they are necessary.
>
> *Id.* at 34:7-12. Thus, Adtran is not entitled to the production of any litigation financing agreements.

(D.I. 361, at 12.) (citations omitted).

Moreover, courts have consistently rejected motions to compel seeking information relating to litigation funding. For example, in *Sedona Corp. v. Open Sols., Inc.*, 249 F.R.D. 19, 25 (D. Conn. 2008), the defendant sought production of financing agreements and further sought information related to plaintiff's fees and expenses incurred in the litigation against the defendant. The defendant argued "that the requested information [was] relevant insofar as the plaintiff may have made representations regarding the allegations and the claims and defenses involved in the litigation during its discussions relating to the financing thereof." *Id*. The court, however, rejected this argument stating that defendant offered "no factual basis for speculating that such representations were made. . . . defendant has therefore failed to establish the relevancy

4

of information regarding the plaintiff's litigation costs or financing." *Id.*

Likewise, in *VHT, Inc. v. Zillow Grp., Inc.*, No. C15-1096JLR, 2016 WL 7077235, at *1–2 (W.D. Wash. Sept. 8, 2016), the court denied defendant's motion to compel seeking information relating to litigation funding. In *VHT*, the defendant argued that the information was necessary to show that plaintiff may have lacked standing or that plaintiff's litigation funder, if any existed, was a necessary party, co-conspirator, or witness. In rejecting defendant's argument, the court explained "[a]lthough [defendant] poses several imaginable hypotheticals in which [plaintiff]'s litigation funding scenario becomes relevant, the dearth of evidence on the record supporting [defendant]'s position renders that information negligibly relevant, minimally important in resolving the issues, and unduly burdensome. . . . Therefore, based on the record before the court, the information is disproportional to the needs of the case."

This Court had also rejected discovery of litigation funding and financial information in *TQ Delta v. Comcast et al.*, 13-cv-2013-RGA (the "MoCA" litigations). There, the defendants sought patent valuation documents, including financial statements. During a hearing on October 11, 2016, Judge Andrews denied the defendants' request for documents such as TQ Delta's financial statements, litigation funding documents, and names of members:[1]

> THE COURT: Okay. All right. So, then the last – or not actually – the next to the last thing is value and valuation documents. And, you know, I know we've discuss this before, have we not?
> [COUNSEL FOR TQ DELTA]:    We have. I believe we have, you[r] Honor.
> THE COURT: So, I cannot remember. Presumably, the one good indication of the value here is that TQ Delta paid some amount of money to Aware for this patent portfolio, right?
> [COUNSEL FOR TQ DELTA]:    The parties disagree as to how probative that is, but, yes, your Honor, that's correct.

---

[1] The relevant excerpts of the transcript from the October 11, 2016 discovery hearing in the case *TQ Delta LLC v. Comcast et al.* was attached to Plantiff's Response To Adtran's Jan. 22, 2018 Discovery Letter; *see Appendix* at A99-A102.

5

THE COURT: Right. So, the parties know how much that's – what that number is, right?

[COUNSEL FOR TQ DELTA]: They do.

THE COURT: Okay. You know, I'm sensitive, I think, to the fact that there is some information, which arguably could be relevant to valuation, which at the same time is information that, in my opinion, the defendants shouldn't have, because it sort of gives them an unfavorable litigation advantage. <u>And, so, I saw in the Proposed Order, stuff about including plaintiff's funding entities that provided funding as part of what I'm being asked to provide. And I don't think the entities that are providing the funding, or the amount of the funding are relevant, or likely to lead to relevant information. And what's more, I think they are – I think really they should be off limits unless they are really necessary, and I don't think they are necessary.</u> In terms of these other things you are asking for, it does strike me that if plaintiffs are busy saying to investors, these patents are worth X, Y, or Z, or something else, that plaintiff's evaluation of the patents is certainly something that an expert would want to consider, right?

\*\*\*

THE COURT: Okay. That's a good answer. So, I find it hard to believe, though you never know, that TQ Delta has -- I would expect TQ Delta has been making representations in some form or fashion. I don't know what they are, as to the value of the patents. So, I'm going to order you to look for such things and to produce them. I'm not going to -- you know, I agree investor reports is kind of a nebulous term, and that's the reason why I'm trying to tell you what I think it is that you should be looking for. Where you would find these things, I don't know. **<u>I don't think it's a profit and loss statement.</u> <u>I don't think it's how much people are actually loading or investing in TQ Delta in order to fund the company. You know, I don't think it's your bank account balance</u>**, but I do think that you probably have made representations about the value of the patents. And, so, I think you should produce such information -- you should find it and produce it. And if you find it on -- if you -- and, so, I'm going to direct that you actually do that. If it turns out that you have nothing, then you can say you have nothing, but I would think you probably have something, okay?

\*\*\*

THE COURT: What I'm saying is -- and I don't know whether it's privileged or not. But I'm not directing you to -- **<u>I don't think you should have to produce something that explains your financing, okay</u>**?

*Id.* at A101-A102.

And, ADTRAN's tersely cited authority is inapposite. In *Gbarabe v. Chevron Corp*, the issue turned on the ability of counsel to service a class action. *See Gbarabe v. Chevron Corp.*, 2016 WL 4154849, at \*1-2 (N.D. Cal. Aug. 5, 2016) (ordering production of plaintiff's litigation funding agreement to determine whether counsel in a class-action lawsuit could commit adequate

6

resources to the class). This case is not even remotely on point here. Nor is *Cobra Int'l, Inc. v. BCNY Int'l, Inc.*, 2013 U.S. Dist. LEXIS 190268, at *7-9 (S. D. Fla. Nov. 4, 2013) apposite here. There, the court ordered (without citing any supporting legal authority) the production of plaintiff's litigation funding agreement. But, in that case, the plaintiff produced no other evidence establishing its ownership of the asserted patents other than a statement by the Company's president that "Cobra continues to own" the asserted patent. *Id.* at *8-9. Thus, because the plaintiff maintained that it had no other documents in its possession <u>other than</u> the litigation funding agreement, the court ordered the production of the agreement to establish whether ownership of the patent has transferred. *Id.*[2]

**Damages.** Nor has ADTRAN articulated any basis as to how litigation financing is somehow relevant to "TQ Delta's damages theories." ADTRAN strains credulity in arguing that "how proceeds are distributed between TQD Delta and its funders" is somehow relevant to any issue of damages. ADTRAN's Objections at 4. *See a lso id* (arguing that TQ Delta is "motivat[ed] to pursue settlements and judgments sufficiently large enough to trigger distribution of profits to both its funders and its members.") No such information could possibly be relevant to any *Georgia-Pacific* hypothetical negotiation or other damages analysis allowable under the case law. (And, contrary to ADTRAN's suggestion, TQ Delta never presented any such "damages theories.").

---

[2] Further, *Leader Techs., Inc. v. Facebook, Inc.*, 719 F. Supp. 2d 373, 376-77 (D. Del. 2010), concluded that the magistrate judge did not commit clear error in determining, although a "close question," that communications exchanged between a party and a third-party litigation financing company were not protected from discovery by the common interest. *Id.* (noting that plaintiff had failed to argue that there were any specific deficiencies or flaws in the magistrate's ruling). That court's holding, however, is inapplicable here because TQ Delta maintains that production of documents relating to litigation funding is completely irrelevant to any claim or defense, and not proportional to the needs of the case and outside of the scope of Fed. R. Civ. P. 26(b)(1).

7

### B. The Special Master Correctly Ruled That Requests regarding Members and (Undefined) Affiliates were Objectionable and otherwise Disproportionate to the Needs of the Case

ADTRAN next argues that, because TQ Delta has no intra-company or other organization charts, it should be forced to scour the company to cobble together documents "sufficient to show" any relationship with undefined "affiliates" or other entities—notwithstanding there is no showing that such companies likely have possession, custody or control of such documents. ADTRAN presented sweeping requests for, among other things, documents sufficient to show all "past and present affiliates" including parent companies, joint ventures, divisions, shareholders. (*E.g.*, Req. 10, A-25.) TQ Delta objected to requests 8-10 as, among other things, over broad, unduly burdensome, not relevant, and not proportional to the needs of the case.

During its three-hour plus hearing, the Special Master queried counsel for ADTRAN, finding that its "end-game" was to find documents given to investors concerning the "value of the patents." (D.I. 361, Order at 4.) Thus, as the Special Master recognized, the matter of "relationships" with "affiliates" or other "entities" was an asserted means to a more targeted end, namely, "valuation documents" provided to investors. In the end, the Special Master sustained the objections provided TQ Delta continued its separate practice of producing valuation documents and documents showing financial bias of witnesses before their testimony is taken. *Id.*

ADTRAN has failed to show that the Order is erroneous. First, ADTRAN fails to acknowledge that the broad scope of its requests impose an undue burden and are not proportional to the needs of the cased. The only scope of asserted relevancy pertained to the limited topic of valuation of documents provided to investors. This was squarely addressed by the Order. Second, ADTRAN's requests sought to impose a sweeping of review of corporate

8

documents to piece together a showing of any "relationship" with companies that have no connection to any issue in this case. For its part, ADTRAN incorrectly seeks to fault the Special Master as failing to consider its assertions. Objections at 7-8. To the contrary, the Special Master specifically queried ADTRAN's counsel about the relevancy of what was sought and narrowed the scope of the overbroad and burdensome requests to provide precisely that subject matter, namely, the "value, validity and infringement" of the patents. ADTRAN also mischaracterizes the Order. The purpose of the Special Master's statement about ADTRAN's decision not to seek specific information by a targeted interrogatory—or to commit to third party discovery even if the court granted its request—was to show that the requested information was of questionable probative value. (D.I. 361, Order at 5.) ADTRAN has made no showing to the contrary. The Special Master reasonably concluded that it is "unlikely that an investor has responsive documents that TQ Delta does not possess or has not produced." *Id*. at 6. Moreover, TQ Delta has already provided documents sufficient to show the only entity that has the right to control that entity. The Court should therefore reject this fishing expedition to improperly assess TQ Delta's resources or to otherwise pursue unfair litigation tactics concerning entities that have no connection to any issue in this case.

        **C.**    **The Court Should Reject ADTRAN's Attempt to Sweep in Settlement Communications Under the Guise of Investor-Related "Valuation" Documents**

Finally, ADTRAN apparently seeks to apply a general statement in the order (regarding validity, infringement, and valuation information provided to investors) to negate specific rulings of the Special Master (and of the Court in related cases) that settlement negotiations are not discoverable. Consistent with orders in the companion cases, TQ Delta agreed to produce executed license and settlement agreements for the asserted patents. Discovery of TQ Delta's <u>ongoing</u> and other settlement discussions, however, would unduly interfere with—and have a

9

chilling effect on—TQ Delta's ongoing licensing efforts. This would stifle good faith settlement efforts, lest every word be scrutinized by adverse parties in other proceedings. Importantly, both Judge Andrews and the Special Master have already ruled against discovery of settlement communications, with the exception of executed agreements and demand letters in matters that resulted in such final agreements. *See TQ Delta, LLC v. 2Wire, Inc.*, 13-1835-RGA, D.I. 0376, Letter from Special Master White on Cross Motions to Compel, at pp. 7-8 (Sept. 29, 2017); *TQ Delta, LLC v. ZyXEL Communications, Inc.*, 13-2013-RGA, D.I. 470, Special Master Order (Jan. 31, 2018) at pp. 5-7. As the Court in *MoCa* stated:

> I don't think *negotiations that haven't come to fruition and agreement yet* are a good subject for interim discovery. *** But in terms of, you know, let's have a deposition every few weeks and ask, so have you done any licensing negotiations, show me all the e-mails you sent, show me all the e-mails you received, you know, that strikes me as, A, of no probative value, because they are negotiations. And until you get to an agreement, you have nothing. And it also just strikes me as interfering -- it just strikes me as a bad thing.

*TQ Delta, LLC v. Comcast Cable Communications, LLC, et al.*, C.A. No. 15-611-RGA (D. Del. June 23, 2016) (emphasis added) (A-97).

Nor can ADTRAN justify imposing a search and review of all negotiation documents to look for statements relating to infringement, value and validity. Here, one can presume that there are large numbers of negotiations given the numerous asserted patents and a large pool of potential licensees throughout the world. The Special Master has thoroughly considered the issues of relevance, burden and proportionality. Consistent with this Court's rulings in the related cases, he found that the only reasonable scope for any such discovery is for claim charts, executed agreements, and demand letters in the case of executed agreements.

Thus, as it has done twice before, the Court should rule against discoverability of draft agreements and negotiations.

Dated:  April 30, 2018

Respectfully submitted,

FARNAN LLP

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, Delaware  19801
(302) 777-0300
(302) 777-0301 (Fax)
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Peter J. McAndrews (admitted *pro hac vice*)
Timothy J. Malloy (admitted *pro hac vice*)
Thomas J. Wimbiscus (admitted *pro hac vice*)
Sharon A. Hwang (admitted *pro hac vice*)
Paul W. McAndrews (admitted *pro hac vice*)
Anna M. Targowska (admitted *pro hac vice*)
MCANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, Illinois  60661
(312) 775-8000
(312) 775-8100 (Fax)
pmcandrews@mcandrews-ip.com

*Counsel for Plaintiff TQ Delta, LLC*