IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TQ DELTA, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>ADTRAN, INC.,<br><br>    Defendant. | Civil Action No. 1:14-cv-00954-RGA |
| ADTRAN, INC.,<br><br>    Plaintiff,<br><br>v.<br><br>TQ DELTA, LLC,<br><br>    Defendant. | Civil Action No. 1:15-cv-00121-RGA |

MEMORANDUM OPINION

Brian E. Farnan, Esq., Michael J. Farnan, Esq., FARNAN LLP, Wilmington, DE; Peter J. McAndrews, Esq., Timothy J. Malloy, Esq., Thomas J. Wimbiscus, Esq., Paul W. McAndrews, Esq., Anna M. Targowska, Esq., James P. Murphy, Esq., MCANDREWS, HELD & MALLOY, Chicago, IL.

Attorneys for TQ Delta.

Kenneth L. Dorsney, Esq., MORRIS JAMES LLP, Wilmington, DE; Paul M. Sykes, Esq., John E. Goodman, Esq., David W. Holt, Esq., Benn C. Wilson, Esq., Jake M. Gipson, Esq., BRADLEY ARANT BOULT CUMMINGS LLP, Birmingham, AL.

Attorneys for Adtran.

May 18, 2018

**ANDREWS, U.S. DISTRICT JUDGE:**

Presently before the Court are Defendant's Motion for Summary Judgment on the License Issue (D.I. 231) and related briefing (D.I. 232, 255, 274).[1]

For the reasons that follow, the Court will **GRANT** Defendant's Motion for Summary Judgment on the License Issue, as to the twenty-eight Patents-in-Suit asserted against products that comply with G.992.3 [ADSL2], G.992.5 [ADSL2+], and/or G.993.2 [VDSL2] standards, and as to the other ten Patents-in-Suit (the "Disputed Patents").[2] (D.I. 231).

## I. BACKGROUND

The Patents-in-Suit relate to Digital Subscriber Line ("DSL") technology. DSL technology "uses digital encoding to provide high-speed data transmission over existing copper wire telephone lines." (D.I. 232 at 3).

The Patents-in-Suit are subject to a license held by Lantiq Deutschland GmbH ("Lantiq"). (D.I. 233, Exh. 1, § 2, Schedule D). Between 1999 and 2009, Lantiq and its predecessors paid Aware, Inc. ("Aware") to develop DSL technology for use in Lantiq DSL chips. During that time, Lantiq obtained a license to any patents obtained by Aware covering the DSL chips. (D.I. 232 at 1; D.I. 255 at 4-5). As Aware invented new DSL technologies, it entered into new or amended licenses with Lantiq. (*See, e.g.,* D.I. 233, Exh. 26, Amendments 1-7). This allowed the parties "to account for the additional value of the improved [and] different inventions." (D.I. 255 at 7).

---

[1] All citations to the docket are to No. 14-954. I refer to Adtran, Inc. as "Defendant," and TQ Delta, LLC as "Plaintiff." However, TQ Delta is the plaintiff in its patent infringement action against Adtran (No. 14-954), and Adtran is the plaintiff in its declaratory judgment action against TQ Delta (No. 15-121).

[2] The parties refer to these ten patents as the "Disputed Patents," because they involve a dispute about contract construction. I adopt this terminology. The Disputed Patents are U.S. Patent Nos. 7,453,881, 7,809,028, 7,978,706, 8,422,511, 7,796,705, 8,335,956, 8,407,546, 8,468,411, 8,645,784, and 8,598,577. (D.I. 232 at 6).

2

Lantiq purchased Aware's DSL business in 2009. In doing so, Lantiq "acquir[ed] a number of Aware's DSL-related patents," and renewed "its license to all others" (the "Lantiq License"). (D.I. 232 at 1).

In 2012, Plaintiff purchased the Patents-in-Suit from Aware, subject to the Lantiq License. (D.I. 232 at 1; D.I. 255 at 5-6). In 2014, Plaintiff filed this patent infringement suit against Defendant. (D.I. 1).

Defendant's accused products contain chips supplied by Lantiq. (D.I. 232 at 1). Defendant contends that as a result, it holds a license to the Patents-in-Suit. (*Id.*). Plaintiff, on the other hand, contends that Defendant does not hold a license to the Patents-in-Suit. (D.I. 255 at 1).

The parties agree that Defendant holds a license to the Patents-in-Suit under the Lantiq License, unless the patents are covered by an exclusion in the Lantiq License (the "Carve-Out"). (D.I. 232 at 2; D.I. 255 at 6). The only issue before the Court is whether the Patents-in-Suit are excluded from the Lantiq License by the Carve-Out. The license, including the Carve-Out, reads as follows:

> (i) Aware hereby grants to Lantiq and its affiliates a non-exclusive, non-transferable (except as specified in Section 10 of the Agreement), perpetual, world wide, royalty-bearing (as set forth in Section 6), irrevocable right and license to the Non-Purchased Patents relating to the DSL Technology to use, have used, develop, have developed, make, have made, provide services related to, market, sell or lease DSL Products and/or Home Networking Products. In no event shall any right or licenses granted by Aware in this Secton 4.1.1 (i) hereunder extend to the use of any Non-Purchased Patents in Wireless Applications. The license granted in this Section 4.1.1 (i) shall not include a license to patents of Aware solely used for or applicable for products compliant with an xDSL standard other than ADSL.128, DSL.Lite, Full Rate ADSL, ADSL2, or ADSL2+, VDSL1 and VDSL2 (including all annexes, appendices, optional features and Derivatives/Extensions).

(D.I. 233, Exh. 18, § 4.1.1). I refer to the final sentence as the Carve-Out. The license goes on to state:

3

> For clarity: the license[] *includes* a license to those patents of Aware for products compliant with other standards provided that those patents are applicable to the aforementioned standards.

(*Id.*) (italics in original). I refer to this as the Clarity Provision.

The "xDSL standard[s]" referenced in the Carve-Out are promulgated by the International Telecommunications Union ("ITU"). (D.I. 232 at 4). The ITU defines "xDSL" as "[a]ny of the various types of Digital Subscriber Lines." (D.I. 233, Exh. 5 at 2).

The parties dispute whether Defendant's products are licensed to two different groups of Patents-in-Suit.

First, the parties dispute whether Defendant's products are licensed to the ten Disputed Patents. Plaintiff alleges that the ten Disputed Patents cover the functionality specified in three particular ITU standards: ITU-T G.998.1 (entitled "ATM-based multi-pair bonding"), ITU-T G.998.2 (entitled "Ethernet-based multi-pair bonding"), and ITU-T G.998.4 (entitled "Improved impulse noise protection for digital subscriber line (DSL) transceivers"). (D.I. 255 at 15; D.I. 233, Exh. 24; D.I. 233, Exh. 7; D.I. 233, Exh. 8). ITU-T G.998.1 and ITU-T G.998.2 together are called "G.bond," and ITU-T G.998.4 is called "G.inp." (D.I. 232 at 5).

Second, the parties dispute whether Defendant's products are licensed to twenty-eight other patents. During discovery, Defendant served an interrogatory asking Plaintiff to "explain in detail each and every basis for [its] contention that an [accused product] is not licensed" under the Lantiq License. (D.I. 233, Exh. 2 at 4-6; D.I. 232 at 13). In response, Plaintiff stated:

> [Defendant's] Accused Products that use a Lantiq DSL chipset and that implement G.992.3 [ADSL2], G.992.5 [ADSL2+], and/or G.993.2 [VDSL2] are licensed under the [twenty-eight] TQ Delta patents, but only to the extent of the G.992.3, G.992.5, and/or G.993.2 functionality provided by such Lantiq chipset.

(D.I. 233, Exh. 2 at 5-6).

4

## II. LEGAL STANDARD

### A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).

### B. Contract Interpretation

The Lantiq License contains a choice of law provision stating that the laws of Switzerland govern the agreement. (D.I. 233, Exh. 15, § 12; D.I. 233, Exh. 18, § 12). However, neither Plaintiff nor Defendant has asserted that Swiss law should apply to the resolution of their dispute. I will therefore apply Delaware contract law. *See Bel-Ray Co. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 440-41 (3d Cir. 1999) ("The parties therefore generally carry both the burden of raising the issue that foreign law may apply in an action, and the burden of adequately proving foreign law to enable the court to apply it in a particular case. . . . Where parties fail to satisfy either burden the court will ordinarily apply the forum's law.").

Under Delaware law, "the threshold inquiry when presented with a contract dispute on a motion for summary judgment is whether the contract is ambiguous." *United Rentals, Inc. v. RAM Holdings, Inc.* 937 A.2d 810, 830 (Del. Ch. 2007). "Delaware law adheres to the objective theory of contracts," meaning that "a contract's construction should be that which would be understood by an objective, reasonable third party." *NBC Universal v. Paxson Commc'ns Corp.*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005). "An ambiguity exists only when a contract is fairly susceptible to two or more reasonable interpretations." *Unwired Planet, Inc. v. Microsoft Corp.*, 193 F. Supp. 3d 336, 342 (D. Del. 2016) (citing *Rossi v. Ricks*, 2008 WL 3021033, at *2 (Del. Ch. Aug. 1, 2008)). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). "If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create ambiguity." *Unwired Planet*, 193 F. Supp. 3d at 342 (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)).

## III. DISCUSSION

The parties dispute whether Defendant's accused products are licensed to the Disputed Patents, and to the twenty-eight other Patents. I will discuss each group in turn.

### A. Disputed Patents

Defendant argues that the Carve-Out does not apply, and its accused products are licensed to the Disputed Patents. (D.I. 232 at 3). Plaintiff disagrees. (D.I. 255 at 1).

The Carve-Out reads as follows:

The license granted in this Section 4.1.1 (i) shall not include a license to patents of Aware solely used for or applicable for products compliant with an xDSL standard other than ADSL.128, DSL.Lite, Full Rate ADSL, ADSL2, or ADSL2+, VDSL1

6

and VDSL2 (including all annexes, appendices, optional features and Derivatives/Extensions).

(D.I. 233, Exh. 18, § 4.1.1). For ease of analysis, I remove language that does not add meaning and substitute certain words with synonyms that improve readability. The provision would then read:

> The license does not include a license to patents solely used for or applicable for products compliant with an unlisted xDSL standard.[3]

Defendant asserts that Aware patents are licensed, so long as they are not "solely used for or applicable for products compliant with unlisted xDSL standards." (D.I. 232 at 15-16). Plaintiff does not disagree with Defendant's assertion. (D.I. 255 at 7). In fact, Plaintiff states, "In non-contract-legalese, . . . the Carve-Out simply means that if a patent is solely used for or applicable for products compliant with [unlisted] xDSL standards, that patent is not licensed." (*Id.*) (emphasis omitted)).

However, the parties disagree as to what the Carve-Out means.

Defendant argues that patents "used for or applicable for products compliant with" listed xDSL standards are licensed. Defendant provides a Venn diagram explaining its position:



---

[3] "Listed" xDSL standards are ADSL.128, DSL.Lite, Full Rate ADSL, ADSL2, or ADSL2+, VDSL1 and VDSL2. "Unlisted" xDSL standards are all other xDSL standards.

7

(D.I. 232 at 16). Defendant represents that a patent that applies to listed xDSL standards is licensed both as to products that comply only with listed xDSL standards and as to products that comply with both listed and unlisted xDSL standards. (D.I. 232 at 15, 19).

Plaintiff, on the other hand, reads the Carve-Out to exclude more patents from the Lantiq License. Plaintiff argues that a patent is not licensed if every product for which that patent is "used" or "applicable" complies with an unlisted xDSL standard. (D.I. 255 at 6-10, 11-12). In other words, Plaintiff argues that the only patents that are licensed are patents covering listed xDSL standards, and no unlisted xDSL standards.

Plaintiff provides the following charts to "visualize the logic set out by the Carve-Out":

| Patent Number | Standards With Which Product Is Compliant | Is Patent Used For or Applicable For Product? | Is Patent Licensed? |
|---|---|---|---|
| x,xxx,xxx | Product 1: VDSL2 | Yes | YES |
| | Product 2: VDSL2 and G.Inp | Yes | |

| Patent Number | Standards With Which Product Is Compliant | Is Patent Used For or Applicable For Product? | Is Patent Licensed? |
|---|---|---|---|
| y,yyy,yyy | Product 1: VDSL2 | No | NO |
| | Product 2: VDSL2 and G.Inp | Yes | |

(D.I. 255 at 9). In Plaintiff's charts, Patent No. y,yyy,yyy is only "used for or applicable for" Product 2. Product 2 is compliant with one listed xDSL standard (VDSL2) and one unlisted xDSL standard (G.inp). Therefore, argues Plaintiff, Patent No. y,yyy,yyy is "solely used for or applicable for" a product (Product 2) that complies with an unlisted xDSL standard (G.inp).[4,5]

---

[4] Plaintiff argues that the phrase "used for or applicable for" is synonymous with "infringed by." (D.I. 255 at 8). Defendant objects to this argument. (D.I. 274 at 3-6). However, I need not consider whether "used for or applicable for" is synonymous with "infringed by." The Carve-Out and the Clarity Provision together are clear no matter the correct interpretation of the "used for or applicable for."

[5] For purposes of construing the Carve-Out, I assume arguendo that G.inp and G.bond are unlisted xDSL standards. Defendant asserts that G.inp and G.bond are not xDSL standards at all. (D.I. 232 at 20). Accordingly, Defendant asserts that the Disputed Patents are "used for or applicable for" products compliant with listed xDSL standards only. If Defendant were correct, then both parties agree that the Disputed Patents would be licensed. (D.I. 232 at 20; D.I. 255 at 9, 15-16).

8

Plaintiff asserts that the Carve-Out applies, and Patent No. y,yyy,yyy is not licensed. (D.I. 255 at 9). But under Defendant's construction of the Carve-Out, Patent No. y,yyy,yyy would be licensed, because Patent No. y,yyy,yyy is "used for or applicable for" a product (Product 2) that complies with a listed xDSL standard (VDSL2), and therefore covers a listed xDSL standard.

Viewed in isolation, the language of the Carve-Out is less than clear. It can be read to comport with each party's construction.

The language comports with Defendants' construction, because it can be read to provide that the licensee does not receive a license to any patents "solely" applicable for products compliant with unlisted xDSL standards. This language can be understood to provide the inverse proposition that the licensee does receive a license to any patents applicable for products compliant with listed xDSL standards.

The language also comports with Plaintiff's construction, because it can be read to provide that a patent is not licensed if every product for which that patent is "used" or "applicable" complies with an unlisted xDSL standard. Plaintiff's example demonstrates that Patent No. y,yyy,yyy is "solely used for or applicable for" a product that complies with an unlisted xDSL standard and thus can be understood to be unlicensed.

But read as a whole, the license agreement is unambiguous. The Carve-Out is followed by the Clarity Provision, which reads:

> For clarity: the license[] includes a license to those patents of Aware for products compliant with other [unlisted xDSL] standards provided that those patents are applicable to the aforementioned [listed xDSL] standards.

(D.I. 233, Exh. 18, § 4.1.1). In simpler terms, the Clarity Provision lists two rules. First, a patent is licensed if it is applicable to listed xDSL standards. Second, that patent is licensed even for

products also compliant with unlisted xDSL standards. In other words, if a patent covers both listed and unlisted standards, it is licensed.

The Clarity Provision comports with Defendant's construction that any patent that applies to a listed xDSL standard is licensed. (D.I. 232 at 16-17). But it does not comport with Plaintiff's construction. First, under the Clarity Provision, a patent that applies to a listed xDSL standard is licensed. This runs counter to Plaintiff's construction that a patent that applies to a listed xDSL standard would not be licensed if all products for which the patent applies also comply with an unlisted xDSL standard. Second, the Clarity Provision permits a patent that applies to a listed xDSL standard to be licensed to a product that is also compliant with an unlisted xDSL standard, without indicating a limit on the number of products compliant with an unlisted xDSL standard to which the patent can be licensed. Plaintiff's construction contradicts this provision by limiting the number of unlisted xDSL standard-compliant products for which a licensed patent can apply.

Accordingly, taken as a whole, the Carve-Out and the Clarity Provision are reasonably subject only to Defendant's interpretation. In sum, any patent that applies to one of the seven listed xDSL standards is licensed. Any patent that does not apply to one of the seven listed xDSL standards is unlicensed. Any patent that applies to both listed and unlisted xDSL standards is licensed.

Given my construction of the Carve-Out and the Clarity Provision, Defendant has shown it holds a license to the Disputed Patents.[6] Plaintiff asserts that the Disputed Patents are "used for or applicable for" the accused products, which practice a listed xDSL standard. (D.I. 232 at 12-13, 17-18; D.I. 233, Exh. 22 at 1). The license agreement unambiguously provides that

---

[6] The language is clear. As a result, I do not consider extrinsic evidence, such as the parties' licensing history, to interpret the Lantiq License. *Unwired Planet,* 193 F. Supp. 3d at 342.

patents "used for or applicable for" products compliant with listed xDSL standards are licensed. Thus, regardless of whether G.bond and G.inp are unlisted xDSL standards, the Disputed Patents are licensed to Defendant.

Accordingly, I will Grant Defendant's Motion for Summary Judgment on the License Issue, as to the Disputed Patents. (D.I. 231).

### B. The Other Twenty-Eight Patents

The parties dispute whether Defendant's accused products are licensed to the other twenty-eight Patents-in-Suit. (D.I. 232 at 14; D.I. 255 at 19-20).

During discovery, Defendant served an interrogatory asking Plaintiff to "explain in detail each and every basis for [its] contention that an [accused product] is not licensed" under the Lantiq License. (D.I. 233, Exh. 2 at 5-7; D.I. 232 at 13). In response, Plaintiff stated:

> [Defendant's] Accused Products that use a Lantiq DSL chipset and that implement G.992.3 [ADSL2], G.992.5 [ADSL2+], and/or G.993.2 [VDSL2] are licensed under the [twenty-eight] TQ Delta patents, but only to the extent of the G.992.3, G.992.5, and/or G.993.2 functionality provided by such Lantiq chipset.

(D.I. 233, Exh. 2 at 6).[7] Furthermore, Plaintiff has stated to this Court, "[B]ecause the Lantiq Chips[,] [Plaintiff] has always conceded are licensed for a certain portion of the TQ Delta portfolio." (D.I. 233, Exh. 23 at 13:8-11).[8]

In briefing, Plaintiff states that it "agrees that those other twenty-eight patents fall within the scope of the license." (D.I. 255 at 19) (emphasis omitted). However, it argues that "there remain other distinct issues that impact whether particular [Lantiq] DSL chipset products and

---

[7] Originally, Plaintiff listed twenty-seven patents. (D.I. 233, Exh. 2 at 6-7). Later, Plaintiff identified a twenty-eighth patent. (D.I. 233, Exh. 2 at 81).

[8] In its opening brief, Defendant argued that this representation means, "[Plaintiff has admitted . . . to this Court that [Defendant's] accused products that use Lantiq DSL chips are licensed under twenty-eight of the thirty-eight Patents-in-Suit pursuant to the Lantiq License." (D.I. 232 at 14). Plaintiff did not respond to this argument in its brief. (*See generally* D.I. 255).

11

particular Adtran DSL products . . . that employ such chipsets are licensed." (*Id.*). Plaintiff argues, "Whether a particular product is licensed depends on . . .whether [Lantiq] paid the requisite royalty for a particular chipset unit and whether the [Lantiq] chipset qualifies as a 'DSL Product' as defined in § 1.1 of the 2009 License Agreement." (*Id.* at 19-20; D.I. 233, Exh. 18 at § 1.1) (emphasis omitted).

However, Plaintiff's interrogatory response and admission to this Court amount to Plaintiff's agreement that the accused products themselves are licensed to the twenty-eight patents.[9]

Accordingly, I will Grant Defendant's Motion for Summary Judgment on the License Issue, as to the twenty-eight of the thirty-eight Patents-in-Suit asserted against products that implement G.992.3 [ADSL2], G.992.5 [ADSL2+], and/or G.993.2 [VDSL2] standards. (D.I. 231).

## IV. CONCLUSION

A separate order will be entered.

---

[9] Defendant notes, "[T]he Lantiq License provides that any failure to pay royalties (which has not occurred) does not terminate the license." (D.l. 274 at 10; D.I. 233, Exh. 18 at § 9.3). However, I need not assess Defendant's argument, given Plaintiff's agreement in its interrogatory response.