IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TQ DELTA, LLC,<br><br>  Plaintiff,<br><br>v.<br><br>ADTRAN, INC.,<br><br>  Defendant. | Civil Action No. 14-954-RGA |
| ADTRAN, INC.,<br><br>  Plaintiff and<br>  Counterclaim Defendant,<br><br>v.<br><br>TQ DELTA, LLC,<br><br>  Defendant and<br>  Counterclaim Plaintiff. | Civil Action No. 15-121-RGA |

MEMORANDUM OPINION

Brian E. Farnan and Michael J. Farnan, FARNAN LLP, Wilmington, DE; Peter J. McAndrews (argued), Timothy J. Malloy, Thomas J. Wimbiscus, Sharon A. Hwang, Paul W. McAndrews, and Anna M. Targowska, MCANDREWS, HELD & MALLOY, LTD., Chicago, IL, attorneys for Plaintiff TQ Delta LLC.

Kenneth L. Dorsney, MORRIS JAMES LLP, Wilmington, DE; Garland Stephens (argued), Mellissa L. Hotze, Justin L. Constant and Rene E. Mai, WEIL, GOTSHAL & MANGES LLP, Houston, TX, attorneys for Defendant Adtran, Inc.

July ___, 2019


**ANDREWS, U.S. DISTRICT JUDGE:**

Currently pending before the Court are Plaintiff's Motion for Summary Judgment on License of the Disputed Patents (D.I. 518)[1] and Defendant's Cross-Motion for Summary Judgment on the License Issue. (D.I. 526). The parties have fully briefed the issues. (D.I. 519, 527, 536, 546). I heard oral argument on June 14, 2019. (D.I. 617).

## I. BACKGROUND

The motions arise from an ongoing dispute between the parties as to ten of the Patents-In-Suit (the "Disputed Patents").[2] I summarized the relevant background in my May 21, 2018 memorandum opinion on the license issue (D.I. 398 at 1-2) and incorporate that background here.

In my May 21, 2018 memorandum opinion, I considered both parties' interpretation of the License Agreement's provisions. "Defendant argue[d] that patents 'used for or applicable for products compliant with' listed xDSL standards[3] are licensed." (D.I. 398 at 7). Defendant provided the following Venn Diagram to illustrate its construction:



---

[1] All docket item citations refer to C.A. No. 14-954 unless otherwise noted.
[2] The parties refer to these ten patents as the "Disputed Patents," because they involve a dispute about contract construction. I adopt this terminology. The Disputed Patents are U.S. Patent Nos. 7,453,881, 7,809,028, 7,978,706, 8,422,511, 7,796,705, 8,335,956, 8,407,546, 8,468,411, 8,645,784, and 8,598,577. (D.I. 232 at 6).
[3] "Listed" xDSL standards are ADSL.128, DSL.Lite, Full Rate ADSL, ADSL2, or ADSL2+, VDSL1 and VDSL2. "Unlisted" xDSL standards are all other xDSL standards

(D.I. 232 at 16). In contrast, "Plaintiff argue[d] that a patent is not licensed if every product for which that patent is 'used' or 'applicable' complies with an unlisted xDSL standard." (D.I. 398 at 8). Plaintiff provided the following charts to illustrate its construction:

| Patent Number | Standards With Which Product Is Compliant | Is Patent Used For or Applicable For Product? | Is Patent Licensed? |
|---|---|---|---|
| x,xxx,xxx | Product 1: VDSL2 | Yes | YES |
| | Product 2: VDSL2 and G.Inp | Yes | |

| Patent Number | Standards With Which Product Is Compliant | Is Patent Used For or Applicable For Product? | Is Patent Licensed? |
|---|---|---|---|
| y,yyy,yyy | Product 1: VDSL2 | No | NO |
| | Product 2: VDSL2 and G.Inp | Yes | |

(D.I. 255 at 19). In my previous opinion, I determined that,

> taken as a whole, the Carve-Out and Clarity Provision are reasonably subject to only to Defendant's interpretation. In sum, any patent that applies to one of the seven listed xDSL standards is licensed. Any patent that does not apply to one of the seven listed xDSL standards is unlicensed. Any patent that applies to both listed and unlisted xDSL standards is licensed.

(D.I. 398 at 10). The parties agreed that my interpretation of the License Agreement is correct. (D.I. 414 at 1; D.I. 528 at 12). However, Plaintiff filed a motion for reconsideration (D.I. 414), which I granted because I believed I made an error of apprehension in the May 21, 2018 memorandum opinion. (D.I. 448 at 6). Defendant then filed a motion for reconsideration of my July 5, 2018 order. (D.I. 455). I granted the motion as to the issue of whether the Disputed Patents apply to a listed standard but maintained my construction of the License Agreement. (D.I. 496 at 3). I then ordered a new set of briefing on the remaining disputed issues. (*Id.*).

The most recent round of briefing has demonstrated that the parties continue to disagree on the interpretation of the License Agreement as both parties continue to refer to their original arguments to guide my analysis. (D.I. 519 at 6; D.I. 617 at 38:2-17). Plaintiff argues, "The Court's interpretation thus is that the test for determining whether a <u>patent</u> is licensed turns on whether the

3

patent applies, or not, to a listed xDSL standard." and the "applies to" language should be interpreted to mean "infringed by." (D.I. 527 at 2, 4-6). In contrast, Defendant argues the disputed patents "apply to" certain listed xDSL standards because the patents address alleged problems with ADSL and VDSL. (D.I. 519 at 8).

The oral argument also demonstrated the parties' differing understandings of my interpretation of the License Agreement. Plaintiff emphasized that the carve-out provision is a patent carve-out. (D.I. 617 at 52:22-24). Plaintiff continued to assert, as it did in previous briefing, that a patent can be carved out under the License Agreement even if it is used in a product that is compliant with both Listed and Unlisted xDSL standards. (*Id.* at 35:5-7.). Defendant emphasizes language from my previous opinion stating, "The license agreement unambiguously provides that patents 'used for or applicable for' products compliant with listed xDSL standards are licensed." (*Id.* at 18:21-19:2; *see* D.I. 398 at 10-11). Defendant argues that the Carve-Out does not exclude any patent for DSL Technology used in the implementations acquired by Lantiq from Aware. Defendant's view is that the Carve-Out only excludes patents solely used for xDSL standards Aware did not develop for Lantiq. (D.I. 617 at 4:23-5:4; 61:21-22; 62:5-15; 65:16-25).

The briefing and argument have further focused the issues motivating the parties' ongoing disagreement about the interpretation of the License Agreement. To avoid the need for further briefing, this opinion will clarify my interpretation of the License Agreement. The parties will have an opportunity to respond to the interpretation before I apply it to the Disputed Patents and the G.bond and G.inp standards.

## II. LEGAL STANDARD

### A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).

### B. Contract Interpretation

The Lantiq License contains a choice of law provision stating that the laws of Switzerland govern the agreement. (D.I. 520, Ex. 1, § 12). However, neither Plaintiff nor Defendant has asserted that Swiss law should apply to the resolution of their dispute. I will therefore apply Delaware contract law. *See Bel–Ray Co. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 440–41 (3d Cir. 1999) ("The parties therefore generally carry both the burden of raising the issue that foreign law may apply in an action, and the burden of adequately proving foreign law to enable the court to apply it in a particular case. . . . Where parties fail to satisfy either burden the court will ordinarily apply the forum's law.").

Under Delaware law, "the threshold inquiry when presented with a contract dispute on a motion for summary judgment is whether the contract is ambiguous." *United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007). "Delaware law adheres to the objective theory of contracts," meaning that "a contract's construction should be that which would be understood by an objective, reasonable third party." *NBC Universal v. Paxson Commc'ns Corp.*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005). "An ambiguity exists only when a contract is fairly susceptible to two or more reasonable interpretations." *Unwired Planet, Inc. v. Microsoft Corp.*, 193 F. Supp. 3d 336, 342 (D. Del. 2016) (citing *Rossi v. Ricks*, 2008 WL 3021033, at *2 (Del. Ch. Aug. 1, 2008)). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). "If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create ambiguity." *Unwired Planet*, 193 F. Supp. 3d at 342 (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)).

## III. DISCUSSION

First, the License provides a positive grant of a license "to the Non-Purchased Patents relating to the DSL Technology to use, [], make, [], sell or lease DSL Products." (D.I. 520, Ex. 1, § 4.1.1(i)). The License Agreement defines a "DSL Product" as:

> an integrated circuit which 1) implements one or more xDSL Standard(s), 2) is based upon or derived from DSL Technology and 3) is sold or distributed by Lantiq and/or its Affiliates.

(*Id.* § 1.1). The Agreement also provides a definition of "Standard" as:

> a communication standard defined and announced by ANSI, ATIS, ETSI, IEEE, the ITU, or any other standardization body which defines DSL and/or Home Networking standards and/or possible successor standards.

(*Id.*, § 1.15).  The Agreement defines "DSL Technology" as:

> any and all elements of Aware's ATechnology and ZTechnology (as defined in [previous agreements]) delivered by Aware to Siemens and/or Infineon under [the previous agreements], as further specified in Appendix A to this Agreement.

(*Id.*, § 1.21).  The definition also makes clear that,

> DSL Technology includes, as specified in Appendix A, Aware's (i) DMT and DSL-Lite/G.992.2 Technology, (ii) ADSL.128 Technology, (iii) Matlab ADSL Simulation Technology, (iv) Full Rate ADSL Technology, (v) G.bis Technology and ADSL2+ Technology including Soft Macro Technology and (vi) VDSL Technology. . . .

(*Id.*).  Thus, an expanded version of the positive license grant would read:

> Aware hereby grants to Lantiq . . . a[n] . . . irrevocable right and license to the Non-Purchased Patents relating to [Aware's ATechnology and ZTechnology (as defined in previous agreements), including Aware's DMT and DSL-Lite/G.992.2 Technology, ADSL.128 Technology, Matlab ADSL Simulation Technology, Full Rate ADSL Technology, G.bis Technology and ADSL2+ Technology including Soft Macro Technology and VDSL Technology] to use, [], make, [], sell or lease [an integrated circuit which 1) implements one or more xDSL communication standards defined and announced by the ITU, 2) is based upon or derived from Aware's ATechnology or ZTechnology and 3) is sold or distributed by Lantiq and/or its Affiliates].

This language makes clear that the License Agreement grants a license to patents related to specified technology used in DSL Products.  These patents may be related to an xDSL standard, but do not need to be used in the xDSL standard itself.[4]

Second, the License Agreement provides a Carve-Out provision.  The Carve-Out reads as follows:

> The license granted in this Section 4.1.1(i) shall not include a license to patents of Aware solely used for or applicable for products compliant with an xDSL standard other than ADSL.128, DSL.Lite, Full Rate ADSL, ADSL2 or ADSL2+, VDSL1 and VDSL2 (including all annexes, appendices, optional features, and Derivatives/Extensions).

---

[4] *See* Appendix (comparing License Agreement's definitions of listed xDSL standards and corresponding technology).

7

(D.I. 520, Ex. 1, § 4.1.1(i)). As I did in my previous opinion, I remove language that does not add meaning and substitute certain words with synonyms that improve readability for ease of analysis. The provision would then read:

> The license does not include a license to patents solely used for or applicable for products compliant with an unlisted xDSL standard.

As I previously determined, the license agreement as a whole is unambiguous. The Carve-Out is followed by the Clarity Provision which reads:

> For clarity: the license[] includes a license to those patents of Aware for products compliant with other standards provided that those patents are applicable to the aforementioned [listed xDSL] standards.

(*Id.*, § 4.1.1(ii)). "[T]he Clarity Provision lists two rules. First, a patent is licensed if it is applicable to listed xDSL standards. Second, that patent is licensed even for products also compliant with unlisted xDSL standards. In other words, if a patent covers both listed and unlisted standards, it is licensed." (D.I. 398 at 9-10). I then, however, misstated how the Clarity Provision comported with the parties' constructions.

When determining whether the Clarity Provision comported with either party's construction of the License Agreement, I misstated the parties' constructions. (*Id.* at 10). I described Defendant's construction as "any patent that applies to a listed xDSL standard is licensed." (*Id.*). I then described Plaintiff's construction as requiring "that a patent that applies to a listed xDSL standard would not be licensed if all products for which the patent applies also comply with an unlisted xDSL standard." (*Id.*). However, after reviewing my previous opinions, the current briefing, and the parties' arguments at the hearing, these descriptions of the parties' positions do not appear to be accurate.

Defendant's construction of the License Agreement is more accurately stated as follows: "any patent used for or applicable for a product compliant with a listed xDSL standard is licensed."

8

(*See* D.I. 617 at 18:21-19:2; 19:14-21; D.I. 232 at 16; D.I. 519 at 6). Plaintiff's construction of the License Agreement is more accurately stated as "a patent used for or applicable for a product that complies with both listed and unlisted standards is only licensed if it is applicable to the listed standard." (*See* D.I. 617 at 35:4-7, 37:1-20, 38:2-21; D.I. 255 at 12; D.I. 527 at 15-16).

The Clarity Provision does not comport with Defendant's construction. Under the Clarity Provision, any patent that is "applicable to a listed xDSL standard" is licensed for products compliant with any standard, even a product that may only be compliant with an unlisted xDSL standard. However, just because a patent is used for or applicable for a *product* compliant with a listed xDSL standard does not mean that patent applies to the listed xDSL standard. For example, a product that complies with both ADSL2+ (a listed standard) and SHDSL (an unlisted standard) may include technology that is only applicable when the product is operated in a manner compliant with SHDSL (the unlisted standard).

However, as I have done consistently, I reaffirm my original interpretation of the License: "In sum, any patent that applies to one of the seven listed xDSL standards is licensed. Any patent that does not apply to one of the seven listed xDSL standards is unlicensed. Any patent that applies to both listed and unlisted xDSL standards is licensed." (D.I. 398 at 10).

The parties continue to disagree about the scope of the license, however, because they dispute the meaning that should be ascribed to "applies to" in my interpretation of the license. Defendant argues, "applies to one of the seven listed xDSL standards" is synonymous with "used for or applicable for products compliant with listed xDSL standards." (D.I. 519 at 13). Further argument by Defendant reveals that Defendant believes that "applies to" should mean "implemented in conjunction with." (*Id.* at 14). Plaintiff argues that a patent only "applies to" subject matter covered by a claim of the patent. (D.I. 527 at 4). In other words, Plaintiff believes

9

that "applies to" should be interpreted to mean "infringed by." (*Id.* at 6). Defendant argues that the language of the Agreement does not support Plaintiff's interpretation because the drafters were sophisticated parties and explicitly acknowledged infringement in other sections of the Agreement. (D.I. 519 at 15-16). In Defendant's view, the parties to the agreement would have said "infringed by" had that been the intended meaning. (*Id.*). While Plaintiff agrees that the parties to the Agreement were sophisticated companies, it argues that "no sophisticated company would ever say that a patent is applicable to a product unless that product had every element of at least one claim." (D.I. 617 at 36:14-16 (referencing slide number six of Plaintiff's presentation)).

I agree with Defendant that "used for or applicable for" and "applies to" do not mean "infringed by." First, it is a principle of contract interpretation that courts "should avoid interpreting contractual language in such a way as to render any term of the contract meaningless or superfluous." *In re Combustion Eng'g*, 366 F. Supp. 2d 224, 231 (D. Del. 2005). The Carve-Out, in simplified language, states:

> The license does not include patents solely *used for* or *applicable for* products compliant with an unlisted xDSL standard.

"Used for" and "applicable for" must thus have different and separate meanings. While "used for" is plausibly synonymous with "infringed by," the use of "applicable for" must thus be broader than "infringed by."

Second, the Clarity provision also indicates that the terms "applicable for," "applicable to" and "applies to" should not be read to mean "infringed by." If the parties had intended that the license was limited to patents that would be infringed by the listed xDSL standards, they could have used the language that Plaintiff would have me read into the Agreement. As Defendant points out, the Agreement references infringement in other portions of the Agreement. (D.I. 520, Ex. 1, §§ 1.25, 8.1-8.3). Additionally, I note that the differing language in the Clarity Provision—

10

"patents . . . for products" versus "applicable to . . . standards"—also counsels against reading the term "applicable to" to mean "infringed by" because it does not indicate that the patents are actually used by or infringed by the standard.

Thus, I determine that the Agreement is unambiguous that "applicable" and "applies to" are broader in scope than "infringed by." A broader interpretation comports with the positive license grant, which clearly encompasses more technology than just the technology used in or infringed by the listed xDSL standards.[5] The language of the Agreement indicates that the "applicable for" / "applicable to" language should be read to mean "could be used in conjunction with." This broader construction of the "applicable for" language ensures that neither the "used for" or "applicable for" language is superfluous as the scope of "used for" and "used in conjunction with" do not overlap. Thus, even assuming that Defendant only uses the patent for products compliant with an unlisted xDSL standard, if the patent "applies to" or "is used for or could be used in conjunction with" a listed xDSL standard and falls within the scope of the positive license grant, it is licensed.

Thus, I will now clarify my construction of the License Agreement. In sum, any patent that falls within the scope of the positive license grant that is used for or could be used in conjunction with one of the seven listed xDSL standards is licensed. Any patent that cannot be used for or in conjunction with one of the seven listed xDSL standards is unlicensed. Any patent within the scope of the positive license grant that is used for or can be used in conjunction with both listed and unlisted xDSL standards is licensed.

### IV. CONCLUSION

An accompanying order will be entered.

---

[5] *See* Appendix.

11

| Appendix: License Agreement's Definition of Standards and Corresponding Technology[6] ||
| --- | --- |
| **Standard** | **Technology** |
| **DSL.Lite or ITU-T G.922.2** (1.6) <br><br> medium speed symmetric and asymmetric DMT based DSL technologies according to the Standard known as "ADSL Lite" developed by the ITU | **DMT and DSL.Lite/G.992.2 Technology** (1.7) <br><br> asymmetric DSL Central Side or Remote Side technology based on Aware's proprietary DMT and DSL technology and modified to be standard compliant and work with DSL.Lite / ITU-T G.992.2 as further specified in Appendix A. |
| **ADSL.128** (1.8) <br><br> asymmetric digital subscriber line technology which is designed to work with Lantiq's 128 kHz analog components | **ADSL.128 Technology** (1.9) <br><br> asymmetric digital subscriber line Central Side or Remote Side technology based on Aware's proprietary DMT and DSL technology, as further specified in Appendix A. |
| **Full Rate ADSL or ITU-T G.992.1** (1.17) <br><br> high speed symmetric and asymmetric DMT based digital subscriber line technologies according to the ANSI standard T1E1,4 T 413 or ITU G.992.1 | **Full Rate ADSL Technology** (1.18) <br><br> the asymmetric digital subscriber line Central Side or Remote Side technology based on Aware's proprietary DMT and DSL technology and modified to be standard compliant and work with Full Rate ADSL, as further specified in Appendix A. |
| **G.bis or ADSL2 or ITU-T G.992.3** (1.26) <br><br> high speed asymmetric DMT based digital subscriber line technology standardized by the ITU and referred to by the ITU as G.dmt.bis (which is the successor to G.dmt, also known as G.992.1) including G.handshake (also known as ITU-T G.994.1), and G.lite.bis (also known as ITU-T G.992.4). | **G.bis technology or ADSL2 Technology** (1.27) <br><br> the asymmetric digital subscriber line Central Side or Remote Side technology based on Aware's proprietary DMT and DSL technology and modified to be standard compliant and work with G.bis, including the Soft Macro Technology, as further specified in Appendix A. |
| **ADSL2+** (1.28) <br><br> higher data rate ADSL Standard standardized by the ITU as a 3rd member of the ADSL2 family | **ADSL2+ Technology** (1.29) <br><br> asymmetric digital subscriber line central side or remote side technology based on Aware's proprietary DMT and DSL technology and modified to be standard compliant and work with ADSL2+, including the Soft Macro technology, as further specified in Appendix A. |

---

[6] D.I. 520, Ex. 1, §§ 1.6-1.9, 1.17, 1.18, 1.26-1.29, 1.32, 1.33.

| Appendix: License Agreement's Definition of Standards and Corresponding Technology ||
| Standard | Technology |
| --- | --- |
| **VDSL1 or ITU-T G.993.1** (1.32)<br><br>the ITU DMT VDSL1 Standard and the ITU VDSL1 Standard and Derivatives/Extensions thereof | **VDSL Technology** (1.31)<br><br>the asymmetric digital subscriber line Central Side or Remote Side technology based on Aware's proprietary DMT and DSL technology and modified to be standard compliant and work with VDSL1 and VDSL2 as further specified in Appendix A. VDSL Technology shall also include backwards capability to Full Rate ADSL, ADSL2, ADSL2+. |