IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TQ DELTA, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>ADTRAN, INC.,<br><br>    Defendant. | Civil Action No. 14-954-RGA |
| ADTRAN, INC.,<br><br>    Plaintiff and<br>    Counterclaim Defendant,<br><br>v.<br><br>TQ DELTA, LLC,<br><br>    Defendant and<br>    Counterclaim Plaintiff. | Civil Action No. 15-121-RGA |

MEMORANDUM ORDER

Currently before me are seven motions submitted by TQ Delta and ADTRAN regarding Family 10. This order will address ADTRAN's Motion to Exclude the Expert Testimony of Dr. Arthur Brody (D.I. 718).[1] I have reviewed the parties' briefing and related papers. (D.I. 719, 769, 786). After full consideration of the briefing, the motion is resolved as follows.

**I.    BACKGROUND**

---

[1] All docket items citations refer to C.A. No. 14-954 unless otherwise noted.

Plaintiff TQ Delta filed this lawsuit against Defendant ADTRAN on July 17, 2014, asserting infringement of one or more patents from ten patent families. (D.I. 1). I have divided the case into separate trials based on families of patents. (D.I. 369). ADTRAN moves under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993) to exclude the infringement and validity opinions of Dr. Brody for Family 10 in their entirety. (D.I. 718).

Dr. Brody's infringement opinions are based on two alternative theories: (1) that the Accused Products infringe asserted claims 5 and 14 of the '660 patent based on their compliance with the VDSL2 standard and on Dr. Almeroth's source code analysis for the BCM65300 chipset; and (2) that the Accused Products infringe asserted claim 5 of the '660 patent based on their compliance with VDSL2 and G.inp Amendment 2 and on Dr. Cooklev's testing results. Dr. Brody also offered a rebuttal to ADTRAN's expert Dr. Zimmerman regarding the invalidity of the '660 patent based on certain combinations of prior art.

## II. LEGAL STANDARD

Federal Rule of Evidence 702 sets out the requirements for expert witness testimony and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Third Circuit has explained:

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that a broad range of knowledge, skills, and training qualify an expert. Secondly, the

2

testimony must be reliable; it must be based on the methods and procedures of science' rather than on 'subjective belief or unsupported speculation; the expert must have good grounds for his or her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity. Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The Supreme Court explained in *Daubert* that Rule 702's helpfulness standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

By means of a so-called "*Daubert* hearing," the district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury. *See Daubert* ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a) of the Federal Rules of Evidence whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.").

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404-05 (3d. Cir. 2003) (cleaned up).

Qualification refers to the requirement that the witness possess specialized expertise. "We have interpreted this requirement liberally, holding that a broad range of knowledge, skills, and training qualify an expert." *TQ Delta, LLC v. 2Wire, Inc.* 373 F. Supp. 3d 509, 516 (D. Del. 2019) (citing *Schneider*, 320 F.3d at 404-05, *see also Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003). "Rule 702's liberal policy of admissibility extends to the substantive as well as formal qualifications of experts." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994). The Third Circuit has "eschewed imposing overly rigorous requirements of expertise and ha[s] been satisfied with more generalized qualifications." *Id.*

An expert is qualified to provide testimony if he/she "posses[es] at least ordinary skill in the pertinent art." *Sonos, Inc. v. D & M Holdings Inc.*, 297 F. Supp. 3d 501, 508 (D. Del 2017). An expert who lacks the literal qualifications of one ordinarily skilled in the art, but who otherwise has sufficient relevant technical experience that will assist the trier of fact to understand the evidence, may still be qualified to testify in the pertinent art. *See, e.g., Tesco*

3

*Corp. v. Weatherford Intern. Inc.*, 750 F. Supp. 2d 780, 795 (S.D. Texas 2010) ("Even if he does not have specific experience studying or working with pipe handling devices, his three degrees in engineering and his experience in oil fields sufficiently qualify Dr. Wooley as an expert on the subject matter of this case. Rule 702 does not require [ ] extreme specificity of expertise...."); *Int'l Gamco, Inc. v. Multimedia Games Inc.*, 732 F. Supp. 2d 1082, 1088 (S.D. Cal. 2010) ("While Ms. Spielman may lack the context in which these patents and technologies at issue are designed and implemented... the main component of the [ ] patent and its technologies at issue is clearly the distributed computing system," with which the expert did have experience.).

"[I]t is not necessary that the expert have expertise in the precise technology that is the subject of the patent or patents in suit." *Sonos*, 297 F.Supp.3d at 510; *see also TQ Delta*, 373 F. Supp. 3d at 527-28 (denying defendant's motion to exclude patentee's technical expert, the court stated, "Defendant attempts to define the pertinent art too narrowly. I determine that [the expert] has sufficient experience with communications systems, including DSL, to offer specialized testimony that would be helpful to the jury."). "However, the level of expertise may affect the reliability of the expert's opinion." *In re Paoli*, 35 F.3d at 741.

## III. DISCUSSION

Dr. Brody has a Bachelor of Science degree in Physics and a Ph.D. in Physics. (D.I. 734, Ex. 2 at Curriculum Vitae). During his time as Vice President for marketing and sales at Technicom Systems, Inc., Dr. Brody "marketed and sold portable loop test equipment with the ability to identify loops with loading coils for surveying outside plants and correcting plant records in preparation for Digital Subscriber Line ('DSL') high-frequency requirements." (*Id.* at ¶ 6). As a consultant, Dr. Brody drafted product requirement and technical specification documents that were used by developmental engineers to build the hardware and software for

4

new telecommunications products. (D.I. 774, Ex. B (Brody Dep. Tr.) at 303:3-304:4). Dr. Brody performed systems testing of new products once they were developed. (*Id.*).

As a technology licensing officer for Columbia University Dr. Brody "evaluated research from the Electrical Engineering and Computer Science departments." (D.I. 734, Ex. 2 at ¶ 6; Brody Dep. Tr. at 307:9-312:24). This research included technology related to "networking, communications and video technologies using or defining the Internet Engineering Task Force protocols such as IP [internet protocol], UDP [user data protocol], RTP [real-time transport protocol], RCTP [real-time control transport protocol] and SIP [session initialization protocol]." (*Id.*). In the 1990s, Dr. Brody began working specifically with DSL technologies, consulting with equipment manufacturers on DSL products intended for the United States market and helping to inform requirements and design relating to the manufacturing and use of DSL technology. (D.I. 734, Ex. 2 at ¶ 6; Brody Dep. Tr. at 314:3-15).

ADTRAN contends that Dr. Brody fails to satisfy the minimum requirements that both parties' experts agree a person having ordinary skill in the art must possess. (D.I. 719 at 1). ADTRAN states, "[H]e is not an engineer and lacks relevant technical experience with digital communications or communications systems such as multicarrier transceivers in the accused products." (*Id.*). ADTRAN points to Dr. Brody's own opinion that a person having ordinary skill in the art relevant to the Family 10 patent would have a bachelor's degree in electrical or computer engineering (or equivalent training or work experience), in addition to two to three years of work experience in digital communications. (*Id.*).

ADTRAN contends that since Dr. Brody's educational background is in Physics, and not Electrical or Computer Engineering, his experience must compensate for the lack of an engineering degree. (D.I. 786 at 2). ADTRAN points to the majority of Dr. Brody's professional

5

experience outside of serving as an expert witness as being related to business management and marketing to disqualify him from offering opinions on technical matters in this case. (*Id.* at 4). ADTRAN explains that Dr. Brody has never designed any hardware or software for a DSL transceiver or any other multicarrier transceiver. (*Id.* at 6). ADTRAN moves for the disqualification of Dr. Brody on the basis that his general experience with telecommunications and networking technology, primarily from the perspective of marketing assessments, has not qualified him as having specialized knowledge in the relevant field of "determining operating margins required for multicarrier communications." (*Id.* at 8).

TQ Delta argues that Dr. Brody is competent because he has a Ph.D. in Physics and more than thirty-five years of experience in development and design of telephony products, including DSL, as well as in operations, administration, and maintenance of telecommunications networks. (D.I. 769 at 1). TQ Delta asserts that this experience is relevant to the VDSL2 standard and the invention of the Family 10 patent. (*Id.*). TQ Delta also points to Dr. Brody's experience serving as an expert witness on other cases involving DSL technology to establish his competency to serve as an expert in this case. (*Id.* at 3). ADTRAN has responded by contending that almost all of Dr. Brody's experience in the field of telecommunications relates to marketing, sales, and business management, not technical design or engineering services. (D.I. 786 at 4). ADTRAN states that Dr. Brody's only true technical experience occurred over thirty years ago. (*Id.* at 3).

I find that Dr. Brody appears well qualified to provide expert witness testimony in this case on the basis of his experience with DSL technology and digital communications systems and concepts. Dr. Brody's years of experience consulting for manufacturers of DSL technologies demonstrates a thorough understanding of the technical specifications and design of DSL hardware and software. *See Motivation Innovations LLC v. Ulta Salon Cosmetics & Fragrance,*

*Inc.*, 59 F.Supp.3d 663, 670 (D. Del. 2014) (holding that witness for owner of patent for discount offer redemption system and method had requisite qualifications to testify as expert in infringement suit, despite his lack of formal education, in light of his thirty-eight years of experience, including experience with systems such as those used by defendant, programming language experience, and work designing retail point-of-sale devices.). Dr. Brody's drafting of products requirements and specifications documents and testing of DSL products to determine compliance with standards further demonstrates his understanding of the technology and its functioning. Taken as a whole, Brody's industry experience demonstrates familiarity in understanding, interpreting, and applying DSL standards to telecommunications products.

Dr. Brody's experience working in the field of operations administration and maintenance of telecommunications networks and products applies generally to the Family 10 patent technology, and specifically to the particular claim limitations in dispute here, which address SNR margins required for DSL communication. ADTRAN argues that Dr. Brody's testimony should be excluded because he does not have specific experience with VDSL2 or G.inp. (D.I. 719 at 6-7). But the issue in this case does not limit the invention's application to these specific standards, as the Family 10 patents deal with the use of different SNR margins for bit allocation for different pluralities of carriers, an improvement that applies to DSL generally. Dr. Brody's detailed descriptions of the patent claims and his infringement analysis demonstrate that his industry experience, which involved analysis of telecommunications products before the development of DSL, together with his doctoral degree in Physics and subsequent work experience in the relevant field, have rendered him sufficiently qualified to opine in detail and with specificity on the accused devices and the technologies they involve.

I am satisfied that Dr. Brody's qualifications are sufficient to make his testimony helpful to the jury in understanding the evidence in this case. ADTRAN's references to a POSITA standard articulated by Dr. Brody, or that of its own witness, do nothing to defeat these qualifications viewed in light of both the standards set by the experts or the general legal standards for qualification of experts in patent disputes. "[I]t is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996) (accepting more general qualifications in holding that a treating physician did not have to practice a particular specialty in order to testify concerning certain matters.).

## IV. CONCLUSION

Thus, ADTRAN's Motion to Exclude the Expert Testimony of Dr. Arthur Brody is DENIED.

IT IS SO ORDERED this 31 day of October, 2019.

United States District Judge