# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TQ DELTA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 14-cv-954-RGA |
| | ) | |
| v. | ) | CONSOLIDATED |
| | ) | |
| ADTRAN, INC., | ) | ███████████████ |
| | ) | |
| Defendant. | ) | **REDACTED** |
| | ) | |

---

### TQ DELTA'S MEMORANDUM IN SUPPORT OF (1) ITS MOTION TO STRIKE THE SUPPLEMENTAL EXPERT REPORTS OF DR. ZIMMERMAN, (2) ITS MOTION FOR SUMMARY JUDGMENT OF INFRINGEMENT FOR FAMILY 7, AND (3) ITS MOTION FOR SUMMARY JUDGMENT OF NO INVALIDITY FOR FAMILY 2

Dated: October 14, 2022

Peter J. McAndrews (admitted *pro hac vice*)
Rajendra A. Chiplunkar (admitted *pro hac vice*)
Ashley M. Ratycz (admitted *pro hac vice*)
MCANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, Illinois 60661
(312) 775-8000
(312) 775-8100 (Fax)
pmcandrews@mcandrews-ip.com

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, Delaware 19801
(302) 777-0300
(302) 777-0301 (Fax)
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Counsel for Plaintiff TQ Delta, LLC*

# TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................... 1

II.  NATURE AND STAGE OF PROCEEDINGS ................................................... 1

III.  LEGAL STANDARDS ...................................................................................... 2

IV.  MOTION TO STRIKE BELATED SUPPLEMENTAL EXPERT REPORTS ................. 3

    A.  Background ................................................................................................. 5

        1.  The Zimmerman Supplemental Reports Violate the Court's Final Scheduling Order ........................................................................ 5

        2.  Dr. Zimmerman's Opinions Are Outside the Scope of Adtran's Final Non-infringement Contentions ......................................... 6

        3.  The Zimmerman Supplemental Reports Contain Improper Rebuttal ......... 7

    B.  Argument ................................................................................................... 9

        1.  Adtran's Disclosure of the First and Second Supplemental Reports Violates the Court's Final Scheduling Order and Rule 26(e) .................... 9

        2.  The *Pennypack* Factors Heavily Favor Exclusion ................................... 10

            a.  TQ Delta Is Prejudiced................................................................. 10

            b.  TQ Delta Cannot Cure the Prejudice .......................................... 11

            c.  Allowing Further Discovery Would Disrupt the Trial Schedule .................................................................................... 11

            d.  Adtran was Willful in Violating the Disclosure Rules ................. 12

            e.  Adtran's New Defense is Not Important to its Case..................... 12

V.  ADTRAN'S ACCUSED PRODUCTS INFRINGE THE FAMILY 7 PATENTS .......... 12

    A.  Background................................................................................................. 13

    B.  Argument................................................................................................... 14

        1.  The Accused Products are Reasonably Capable of Performing L2 Power Mode Functionality......................................................... 14

2.    L2 Power Mode as Described in the ADSL2/2+ Standard and Implemented by the Broadcom 65300 DSL Chip is a Sleep Mode .......... 15

3.    Other Non-Infringement Arguments ........................................................... 16

VI.    THE FAMILY 2 PATENTS ARE NOT INVALID UNDER 35 U.S.C. §§ 102 OR 103 .................................................................................................................... 17

VII.    CONCLUSION ............................................................................................... 20

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) ........................................................................................................ 3

*Bridgestone Sports Co. Ltd. v. Acushnet Co.*,
C.A. No. 05-132 JJF, 2007 WL 521894 (D. Del. Feb. 15, 2007) ............................................. 3

*Bridgestone Sports Co. v. Acushnet Co.*,
No. 05-132-JJF, 2007 U.S. Dist. LEXIS 11370 (D. Del. Feb. 15, 2007). ................................. 3

*MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*
420 F.3d 1369 (Fed. Cir. 2005) ............................................................................................ 3

*Meyers v. Pennypack Woods Home Ownership Ass'n*,
559 F.2d 894 (3d Cir. 1977) ....................................................................................... passim

*PIC Inc. v. Prescon Corp.*,
485 F. Supp. 1299 (D. Del. 1980) ......................................................................................... 2

**Rules**

Fed. R. Civ. P. 16 .................................................................................................. 1, 2, 9

Fed. R. Civ. P. 26 ................................................................................................ 1, 2, 10

Fed. R. Civ. P. 37 ............................................................................................. 1, 2, 3, 10

Fed. R. Civ. P. 56 ........................................................................................................ 3

**Statutes**

35 U.S.C. § 102 ................................................................................................. 1, 17, 20

35 U.S.C. § 103 ................................................................................................. 1, 17, 20

## I.    INTRODUCTION

This consolidated brief corresponds to three motions filed by Plaintiff TQ Delta, LLC ("TQ Delta"). First, pursuant to Fed. R. Civ. P. 16, 26, and 37, TQ Delta moves to strike Defendant Adtran Inc.'s ("Adtran") two belated expert reports of Dr. Zimmerman regarding infringement of claims 17 and 18 of U.S. Patent No. 7,453,881, Ex.[1] A (the "881 Patent") and claim 6 of U.S. Patent No. 8,422,511, Ex. B (the "511 Patent") (collectively, "Family 2 Patents" or "Asserted F2 Claims").[2]

Second, TQ Delta moves for summary judgment of infringement of claims 18 and 22 of U.S. Patent No. 6,445,730 ("730 Patent"), claims 1 and 2 of U.S. Patent No. 7,978,753 ("753 Patent"), and claim 14 of U.S. Patent No. 8,437,382 ("382 Patent") (collectively, "Family 7 Patents" or "Asserted F7 Claims"). There is no genuine dispute that the Accused Products[3] natively include the necessary software and firmware to implement the L2 low power state required by the ADSL2 /ADSL2+ standards, upon which there is no genuine dispute the Asserted F7 Claims read.

Third, TQ Delta moves for summary judgment that claims 17 and 18 of the 881 Patent and claim 6 of the 511 Patent are not invalid pursuant to 35 U.S.C. §§ 102/103.

## II.    NATURE AND STAGE OF PROCEEDINGS

On July 17, 2014, TQ Delta sued Adtran for patent infringement. D.I. 1. The Court divided the case into separate trials per patent family. D.I. 369. The present motion relates to Family 2 and

---

[1] All "Ex." cites are to the exhibits included with the Declaration of Ashley M. Ratycz, dated October 14, 2022, submitted herewith.

[2] The two belated reports are the Supplemental Expert Report of George Zimmerman Regarding Non-Infringement of the Asserted Claims of U.S. Patent Nos. 7,453,881 and 8,422,511 (Ex. C) and the Second Supplemental Expert Report of George Zimmerman Regarding Non-Infringement of the Asserted Claims of U.S. Patent Nos. 7,453,881 and 8,422,511 (Ex. D).

[3] The "Accused Products" are those products containing the ███████████████, which include the devices containing the following part numbers: ████████████████████████████████████████████████████████████████████████ *See* Ex. E at pp. 27, 29.

Family 7. TQ Delta served its final infringement contentions on June 30, 2018. D.I. 369 at p. 5. Adtran served its final non-infringement contentions on the last day of discovery, October 1, 2018. Fact discovery closed on October 1, 2018. D.I. 369 at p. 2.

TQ Delta's opening expert reports addressing infringement for Family 2 were served on March 30, 2022 (D.I. 1382), Dr. Zimmerman's Rebuttal Report addressing non-infringement was served on May 13, 2022 (D.I. 1392), and TQ Delta's reply reports addressing infringement were served on June 3, 2022 (D.I. 1392). On June 10, 2022, Adtran served the First Supplemental Report of Dr. Zimmerman. D.I. 1399. Expert discovery closed on June 29, 2022. D.I. 1403. On July 13, 2022, Adtran served the Second Supplemental Report of Dr. Zimmerman. D.I. 1407.

TQ Delta's opening expert reports addressing infringement for Family 7 were served on September 23, 2020, Mr. McNair's Rebuttal Report addressing non-infringement was served on October 23, 2020, and TQ Delta's reply reports were served on November 6, 2020 (D.I. 1392).

## III.    LEGAL STANDARDS

When a party fails to adhere to the Court's scheduling order, Fed. R. Civ. P. 16(f)(1)(C) provides that the Court may issue any sanction authorized by Rule 37(b)(2)(A)(ii-vii), which includes exclusion of evidence at trial. *See* Fed. R. Civ. P. 16(f)(1)(C); Fed. R. Civ. P. 37(b)(2)(A)(ii). Under Rule 26(e)(1)(A), "a party who has. . . responded to an interrogatory . . . must supplement or correct its disclosure or response. . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]" Fed. R. Civ. P. 26(e). Rule 26(e) "is designed to prevent a party from surprising his adversary by setting forth new facts. . . not disclosed during the discovery process." *PIC Inc. v. Prescon Corp.*, 485 F. Supp. 1299, 1301 (D. Del. 1980). Fed. R. Civ. P. 37 provides that "if a party fails to provide information. . . as required by Rule 26. . . (e), the party is

not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially harmless." Fed. R. Civ. P. 37(c)(1).

"The decision to exclude evidence lies within the discretion of the Court." *Bridgestone Sports Co. Ltd. v. Acushnet Co.*, C.A. No. 05-132 JJF, 2007 WL 521894, at *4 (D. Del. Feb. 15, 2007) (precluding use of belated prior art references). Courts in the Third Circuit consider five factors when deciding whether to preclude evidence:

> (1) the prejudice or surprise to a party against whom the evidence is offered; (2) the ability of the injured party to cure the prejudice; (3) the likelihood of disruption of the trial schedule; (4) bad faith or willfulness involved in not complying with the disclosure rule; and (5) the importance of the evidence to the party offering it.

*Bridgestone Sports Co,* 2007 WL 521894, at *4 (citing *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904–05 (3d Cir. 1977)).

Summary judgment should be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is considered genuinely disputed only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once "the movant shows a prima facie case for summary judgment, then the burden of production shifts to the nonmovant to present specific evidence indicating there is a genuine issue for trial." *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1373 (Fed. Cir. 2005) (citing *Anderson*, 477 U.S. at 250).

## IV.    MOTION TO STRIKE BELATED SUPPLEMENTAL EXPERT REPORTS

TQ Delta's theory of infringement is that the Accused Products infringe the Family 2 patents ***as sold*** by Adtran because they include the hardware and software that provides for bonding capability as defined in the ITU-T VDSL2 and G.998.2 standards upon which the Asserted F2 Claims read. As this Court previously held, a device infringes if the relevant

functionality can be activated in the device without modification of the underlying source code. *See* D.I. 1319 at p. 12. That is precisely the situation for Family 2.

Adtran's original non-infringement position for Family 2 was that (1) standardized bonding functionality pointed to by TQ Delta is optional and TQ Delta has not proven that Adtran's Accused Products actually meet each limitation of the Asserted F2 Claims; and (2) the interface of the Accused Products and the DSL chipset do not communicate so there is no way to set or alter DSL transmission parameters. *See, e.g.,* Ex. F at pp. 5-6, 11. Adtran never argued in its final non-infringement contentions that the relevant bonding functionality cannot be turned on.

However, in his expert rebuttal report, Adtran's expert, Dr. Zimmerman, opined that the relevant bonding functionality cannot be turned on and supported this with purported testing that was performed by Adtran engineer, Mr. Chip Gusler, at Dr. Zimmerman's direction. TQ Delta's expert, Dr. Rudnick, explained in her reply report, based on her analysis of source code and technical documents, how the testing was flawed and, if done properly, bonding could have been turned on. Thereafter, Dr. Zimmerman submitted a First Supplemental Report where he relied on new tests by Mr. Gusler and again concluded that the bonding functionality could not be turned on. Dr. Rudnick, at her deposition, again explained how the testing reflected in the First Supplemental Report was flawed and how, if done properly, bonding could have been turned on. After Dr. Rudnick's deposition, Dr. Zimmerman submitted his Second Supplemental Report where he, for the third time, directed Mr. Gusler to perform additional testing of the Accused Products and concluded that bonding could not be turned on.

Dr. Zimmerman should not be permitted to opine that the bonding functionality could not be turned on in the Accused Products because that was not a non-infringement position that Adtran set forth in its final non-infringement contentions. Further, Dr. Zimmerman certainly should not

be permitted to submit, without leave, two supplemental expert reports describing testing that he directed Mr. Gusler to perform where Adtran has steadfastly refused to allow TQ Delta's experts the ability to perform similar tests (by providing the password necessary to access the level of the command line interface where the relevant bonding functionality can be turned on). Worse yet, Adtran has also refused to make Mr. Gusler available for a deposition where it is clear that Dr. Zimmerman blindly relied on Mr. Gusler to set up the equipment properly.

All of the *Pennypack* factors weigh in favor of striking Dr. Zimmerman's new reports.

**A.    Background**

**1.    The Zimmerman Supplemental Reports Violate the Court's Final Scheduling Order**

On June 10, 2022, after the date for service of rebuttal expert reports, Adtran served a 110-page First Supplemental Report that included additional testing of the Accused Products performed by Chip Gusler whom Adtran has repeatedly refused to make available for deposition.[4] Adtran's expert, Dr. Zimmerman was deposed on June 16, 2022. TQ Delta's expert, Dr. Elizabeth Rudnick was deposed on June 21, 2022. On July 13, 2022, after the close of expert discovery, Adtran served an additional 89-page Second Supplemental Report that furthered additional testing of the Accused Products performed by Mr. Gusler. The Court's Final Scheduling Order does not permit the filing of additional expert reports "without either the consent of all parties or leave of the Court." *See* D.I. 369 at p. 6. TQ Delta did not consent to Dr. Zimmerman's two additional non-infringement

---

[4] Adtran relied on Mr. Gusler for several other patent families. Adtran relied on Mr. Gusler in the Family 10 case but refused to provide him for a deposition. TQ Delta ultimately sought intervention from the Special Master but its request was denied. *See* D.I. 658 (TQ Delta Motion to Compel Chip Gusler for a deposition); Ex. G (TQ Delta's July 17, 2019 Letter to the Sp. Master); D.I. 793 (order from Special Master denying TQ Delta's motion to compel). Adtran also relied on Mr. Gusler in the Family 6 and likewise refused to provide Mr. Gusler for a deposition. *See, e.g.,* Ex. H (email from TQ Delta to Adtran requesting deposition of Chip Gusler for Family 6) at p. 1 ("ADTRAN will not make Mr. Gusler available for deposition").

expert reports and Adtran did not seek leave to serve them.

### 2.    Dr. Zimmerman's Opinions Are Outside the Scope of Adtran's Final Non-infringement Contentions

TQ Delta's Interrogatory No. 2 states:

For each Accused Product, state and explain with particularity each reason why Defendant contends that such Accused Product does not infringe each of TQ Delta's Patents-in-Suit that are identified in TQ Delta's Initial Claim Charts (and any supplement thereto).

Ex. I at p. 7. In Adtran's October 1, 2018 response to TQ Delta's Interrogatory No. 2, Adtran submitted its final non-infringement contention charts, which stated, in relevant part, that "ADTRAN does not otherwise retain records documenting whether any of its products comply with any specific provisions of the cited ITU-T Recommendations" and that "TQ Delta has not established that any of the provisions cited in support of its infringement contentions regarding this patent are mandatory." *See, e.g.,* Ex. F at pp. 2, 8, 14, 19, 24, 31, 38. Further, Adtran stated that the ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████." *See, e.g., id.* at pp. 5-6, 11.

In his Rebuttal Report, however, Dr. Zimmerman opined that the Accused Products do not infringe because the relevant bonding functionality cannot be turned on. His opinion was based on Mr. Gusler's testing of the Accused Products which Dr. Zimmerman purports to have directed and observed. Furthermore, in both of Dr. Zimmerman's supplemental reports Dr. Zimmerman likewise opined that the Accused Products do not infringe because the bonding functionality cannot be turned on. Adtran, however, never asserted in its final infringement contentions that the bonding functionality identified by TQ Delta cannot be turned on in the Accused Products.

### 3.    The Zimmerman Supplemental Reports Contain Improper Rebuttal

In her opening expert report, TQ Delta's expert, Dr. Rudnick, explained how the relevant bonding functionality can be turned on in the Accused Products by entering certain commands into the various interfaces of the Accused Products. Importantly, activation of the bonding functionality as described by Dr. Rudnick does not require modification of the underlying source code of the Accused Products nor do any other features of the Accused Products pose any structural barriers that prevent carrying out the bonding functionality recited in the asserted claims. *See* D.I. 1319 at p. 9 (this Court finding infringement of the Family 6 patents where "[a]ctivation of [the infringing functionality] does not require modification of the source code, nor do other features of the apparatus pose structural barriers to carrying out the infringing functionality.").

In the Zimmerman Rebuttal Report, Dr. Zimmerman included a section entitled "Attempt to Configure an Accused Product Using Dr. Rudnick's Procedure Was Unsuccessful" where he asserts that an Adtran engineer, Mr. Chip Gusler, followed the steps outlined by Dr. Rudnick in her opening report to configure internal PTM bonding. *See* Ex. J (Excerpt of Zimmerman Rebuttal Report) at §XV.A. In particular, Dr. Zimmerman states that he "was provided a setup in which [he] could observe and direct via a Microsoft Teams environment the interaction of ADTRAN Design Engineer Chip Gusler as he attempted to perform Dr. Rudnick's procedure." *Id.* at ¶192. Dr. Zimmerman ultimately concluded that "Dr. Rudnick's procedure results in the Accused Product being placed ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. *See id.* at ¶292.

In Dr. Rudnick's Reply Report, she explained how Mr. Gusler incorrectly performed the procedure that she outlined in her opening report for enabling the bonding functionality. *See* Ex. K (Rudnick Reply Report) at §II.E. For example, Dr. Rudnick pointed out that Mr. Gusler entered

certain commands into the wrong subsystem. *See, e.g., id.* at ¶23 

). She also pointed out that Mr. Gusler used certain commands that are

specific to a different *external* bonding mode and not needed for internal bonding. *See id.*

In sum, Dr.

Rudnick explained, in her Reply Report, how Dr. Zimmerman's testing of the Accused Products

was flawed because Mr. Gusler did not accurately follow the procedure that she described.

In his First Supplemental Report, Dr. Zimmerman alleged that he had corrected the

mistakes that he made in this Rebuttal Report by again directing Mr. Gusler to test the Accused

Products and attempt to turn on internal PTM bonding. *See* Ex. C (First Supplemental Report) at

§IV. Dr. Zimmerman ultimately concluded once again that internal PTM bonding cannot be

implemented on the Accused Product based on the procedures described by Dr. Rudnick.

Dr. Rudnick was deposed on June 21, 2022. During her deposition, Dr. Rudnick was asked

questions about the testing that Dr. Zimmerman had performed with the help of Mr. Gusler as

described in his First Supplemental Report. Dr. Rudnick explained that Mr. Gusler made errors in

provisioning the second line that resulted in the second line never properly being configured. *See,*

*e.g.,* Ex. L (Excerpt Dep. Tr. Dr. Rudnick Family 2) at pp. 71-73 ("So what Dr. Zimmerman had

Mr. Gusler do is he correctly provisioned the first line, and he did not correctly or fully provision

the second line."); *see also id.* at p. 99 ("**Q.** In any of the tests that Dr. Zimmerman perform or had

Chip Gusler perform, was the second line configured correctly? **A.** No, not in my opinion, it was

not configured correctly."). Almost a month later, after expert discovery had closed, Dr. Zimmerman again purported to correct the mistakes identified by Dr. Rudnick at her deposition by submitting a Second Supplemental Report where he again had Mr. Gusler perform additional testing on the Accused Products. *See* Ex. D (Zimmerman Second Supplemental Report) at §IV.

### B.    Argument

The Court should strike the First and Second Supplemental Expert Reports of Dr. Zimmerman under Rule 37 because they were served in violation of the Court's Final Scheduling Order and Rule 26. Analysis of the *Pennypack* factors heavily favors exclusion.

### 1.    Adtran's Disclosure of the First and Second Supplemental Reports Violates the Court's Final Scheduling Order and Rule 26(e)

Under Fed. R. Civ. P. 16, a party is required to adhere to the Court's scheduling and pretrial orders. *See* Fed. R. Civ. P. 16(f). The Court's Final Scheduling Order sets forth the exchange of expert reports as follows: first, the party with the initial burden of proof serves an opening expert report; second, supplemental disclosure to contradict or rebut evidence on the same matter is submitted by the opposing party in a rebuttal report; and third, the party with the initial burden of proof may file a reply report. *See* D.I. 369 at p. 6. The Court's Final Scheduling Order makes clear that "[n]o other expert reports will be permitted without either the consent of all parties or leave of the Court." *Id.*

Opening expert reports were due on March 30, 2022, rebuttal reports were due on May 13, 2022, reply reports were due on June 3, 2022, and expert discovery closed on June 29, 2022. *See supra* at §II. Dr. Zimmerman's First Supplemental Report was served on June 10, 2022 and the Zimmerman Second Supplemental Report was served on July 13, 2022. Adtran did not seek or receive TQ Delta's consent to serve additional expert reports nor did Adtran seek leave of the

Court to do so. As such, those reports violate the Court's Final Scheduling Order and should be stricken under Rule 37.

Additionally, Adtran's final non-infringement contentions did not include any argument that the Accused Products do not infringe because bonding cannot be turned on. If that was an argument that Adtran intended to rely on, then Adtran was required to supplement its response to TQ Delta's Interrogatory No. 2 pursuant to Rule 26(e). *See* Fed. R. Civ. P. 26(e). Adtran did not do so. As such, Adtran's reliance on a new non-infringement defense set forth in the First and Second Supplemental Reports should be stricken under Rule 37.

### 2. The *Pennypack* Factors Heavily Favor Exclusion

#### a. TQ Delta Is Prejudiced

The first *Pennypack* factor strongly favors exclusion. Adtran's decision to submit not one, but two supplemental reports unduly prejudices TQ Delta. Both of these reports include additional testing of the Accused Products that Dr. Zimmerman directed Mr. Gusler to perform. This additional testing is prejudicial because the First Supplemental Report was disclosed *after* TQ Delta's experts submitted their reply reports and the Second Supplemental Report was disclosed *after* the close of expert discovery. As such, TQ Delta's experts did not have a chance to fully respond to such opinions. Moreover, Adtran never disclosed a non-infringement theory that the bonding functionality cannot be turned on in the Accused Products so Adtran should not be permitted to do so now.

Worse yet, the testing that Dr. Zimmerman relies on was performed by Chip Gusler, an Adtran Engineer whom Adtran has steadfastly refused to make available for deposition on late-disclosed evidence of product testing.  As such, TQ Delta has no way to verify that the testing was performed in accordance with the procedure outlined in Dr. Zimmerman's reports. Moreover, the interface that Mr. Gusler purportedly used to test the Accused Products is password protected and

Adtran has refused to give TQ Delta access to such interface so that TQ Delta's experts could perform similar testing. Therefore, TQ Delta has been shut out from independently verifying the bases for Dr. Zimmerman's opinions. For all of these reasons, TQ Delta has been unduly prejudiced by the additional testing submitted in Dr. Zimmerman's supplemental reports and they should be stricken.

### b.    TQ Delta Cannot Cure the Prejudice

The second *Pennypack* factor also favors exclusion. TQ Delta has no ability to cure the prejudice Adtran caused by serving the two supplemental Zimmerman reports. Because the First Supplemental Report was submitted after reply reports were due and the Second Supplemental Report was submitted after the close of expert discovery, TQ Delta has no opportunity to respond to the additional testing information that was submitted by Dr. Zimmerman. Moreover, as explained *supra,* Adtran has repeatedly resisted any attempt by TQ Delta to depose Mr. Gusler and has refused to provide TQ Delta with access to the interface that he used to test the Accused Products. Thus, there is no way for TQ Delta to cure the prejudice caused by the new testing information submitted with Zimmerman's First and Second Supplemental Reports. This *Pennypack* factor heavily favors exclusion.

### c.    Allowing Further Discovery Would Disrupt the Trial Schedule

Allowing Adtran and its expert to rely on the new testing information submitted with Zimmerman's First and Second Supplemental Reports would disrupt and delay the trial schedule because it would necessarily require additional discovery and further exchange of expert reports. If Adtran is allowed to rely on the additional testing information, due process would require that TQ Delta have the opportunity to depose Mr. Gusler, re-depose Dr. Zimmerman, and submit additional expert reports that respond to the new information. Furthermore, it would require that Adtran provide TQ Delta with access to the interface that Mr. Gusler used for his testing so that

11

TQ Delta's experts can independently test the Accused Products. Even though there is currently no trial date set for the Family 2 case, re-opening discovery and allowing TQ Delta's experts time to perform testing and respond to the new testing opinions submitted by Dr. Zimmerman will take months and certainly will delay any trial date set in the near future. *Cf.* D.I. 807 at pp. 3-4 (where defendant did not have time to conduct independent discovery this Court finding that the prejudice to the defendant could not be cured before trial). This factor favors exclusion.

### d.    Adtran was Willful in Violating the Disclosure Rules

Adtran has no valid excuse for its belated disclosure of a new non-infringement defense in its expert rebuttal report, much less in two supplemental reports, one of which was served ***after*** the close of expert discovery. If Adtran intended to argue that the bonding functionality could not be turned on as a defense to TQ Delta's claims of direct infringement, then there is no reason why Adtran could not have disclosed such defense at the earliest stages of the case and, certainly, no later than in its final non-infringement contentions. This factor slightly favors exclusion.

### e.    Adtran's New Defense is Not Important to its Case

Adtran's additional testing of the Accused Products is not important to its case. As explained above, Adtran has numerous alternative non-infringement positions. If this particular defense was important to its case, Adtran would have included this defense in its final non-infringement contentions or would have moved to supplement its contentions to add such defense. This *Pennypack* factor slightly favors exclusion.

## V.    ADTRAN'S ACCUSED PRODUCTS INFRINGE THE FAMILY 7 PATENTS

For Family 7, TQ Delta presented substantial unrebutted evidence of infringement. Adtran does not dispute that evidence, and instead relies on an erroneous legal standard. Because there is no genuine dispute of material fact and, under the correct legal standard, infringement is established by unrebutted evidence, the Court should enter summary judgment of infringement.

A.    **Background**

Dr. Arthur Brody opined that the scope of the asserted claims extends to any device that implements the L2 low power state as specified in the ADSL2 /ADSL2+ standards. Dr. Kevin Almeroth analyzed the firmware of the ███████████████████ ("Broadcom Firmware") one or more of which are included in each of the Accused Products, and identified the code that corresponds to L2 low power state. Dr. Elizabeth Rudnick analyzed the source code for the Adtran system software that runs on the network processor in the Accused Products and allows a user to update settings of the BCM65300 chip(s) ("Adtran Source Code"). Dr. Rudnick identified the code that processes commands entered at the command line interface ("CLI") of the Accused Products, including commands that ████████████████ as specified in the ADSL2 /ADSL2+ standards. Based on all of that evidence, Dr. Brody opined that the Accused Products ███████████████ and, thus, concluded that the Accused Products include every element of the asserted claims of the Family 7 Patents.

Adtran's expert, Mr. Bruce McNair, has not rebutted any of those opinions. Instead, Mr. McNair argues that an Adtran customer cannot enable the L2 low power state because access to the commands that control that functionality is purportedly password protected, █████████ ███████████████████████████████. As an initial matter, as this Court found in the Family 6 case, there is no basis in the asserted claims or the law to support the notion that password protection of this feature of the Accused Products can eliminate infringement, as Mr. McNair apparently asserts. *See* D.I. 1319. The Accused Products infringe because, as sold, they include hardware, firmware, and software that provides the infringing functionality without the need to rebuild or re-code. And Dr. Rudnick explained that ████████ ████████████████████████████████████████ ███████████████████

In particular, Adtran's expert, Mr. McNair contends that:



Ex. M (McNair Rebuttal Report) at ¶67.

**B.      Argument**

**1.      The Accused Products are Reasonably Capable of Performing L2 Power Mode Functionality**

Mr. McNair's Reasons 1 through 9 are not viable defenses in view of the Court's Family 6

ruling.  Addressing the infringing Dynamic D functionality, the Court found that:

> it is undisputed that enabling Dynamic D activates functionality that is already present in the source code . . . . The process of activation also indicates that no modification of source code is necessary to enable Dynamic D. When a command is issued in the CLI, the command acts as a switch to turn 'on' or 'off' different parts of the underlying source code in the same way that pressing buttons or making selections in a graphical user interface would modulate functionalities provided by the source code. . . ..  In other words, the CLI runs the code; it is not used to write or edit the code. The command used to enable Dynamic D in the Accused Products

14

is issued through the CLI and does not require that the source code itself be edited for the command to be used.

D.I. 1319 at pp. 10-11.  The same reasoning applies here.  Dr. Rudnick demonstrated that the same Adtran CLI that allowed a user to enable Dynamic D also allows a user to ███████████. *See* Ex. N at pp. 4-6.  Dr. Rudnick's opinion on this point is unrebutted.

### 2. L2 Power Mode as Described in the ADSL2/2+ Standard and Implemented by the Broadcom 65300 DSL Chip is a Sleep Mode

On March 10, 2022, the Court addressed additional *Markman* disputes in Family 7. *See* D.I. 1379.  The Court construed "sleep mode" as "a mode in which the circuitry is not transmitting or receiving content, and the amount of power consumed is less than when operating in full power mode" "[A] transmitter or receiver portion capable of: placing at least one component of a first multicarrier transceiver in a sleep mode" and "reducing power to selected portions of transceiver circuitry" were construed to have their plain and ordinary meaning.

Mr. McNair contends that the Accused Product do not implement a sleep mode as construed because in ██████████████████████████████ ██████████████████████████████ ██████████████████████████ Ex. M (McNair Rebuttal Report) at ¶326.  Mr. McNair's argument appears to be that to qualify as a sleep mode a product, as a whole, should be neither transmitting nor receiving content. The claims do not so require. Rather, the relevant portion of claim 14 of the 382 patent is reproduced below.

14[Preamble] – A multicarrier transceiver having a sleep mode capability, comprising:

14[a] – a transmitter or receiver portion capable of:

14[b] – placing at least one component of a first multicarrier transceiver in a sleep mode;

15

14[e] – using the at least one stored parameter, for transmission or reception, in response to a signal to awaken from the sleep mode; and

14[f] – restoring the at least one component of the first multicarrier transceiver from the sleep mode to the full power mode . . .

Mr. McNair does not dispute that the Accused Products are capable of placing the transmitter in a low power mode. The transmitter is the recited "one component of a first multicarrier transceiver." Dr. Brody explained that:



Ex. O (Brody Reply Report) at ¶¶51-52. Dr. Brody's opinion on this point is unrebutted and, thus, no reasonable jury could find that the claims are met by placing the transmitter in sleep mode.

### 3.     Other Non-Infringement Arguments

Mr. McNair also opined that:



Ex. M at ¶165 (emphasis added). As an initial matter, Dr. Rudnick demonstrated that the ███████

██████████████████████████████████████     Separately and more importantly,

Mr. McNair did not carry out an independent review of the code. In fact. Mr. McNair admitted that Adtran's counsel, Mr. Benn Wilson "assisted" him in identifying the source code files. Ex. P (McNair Dep. Tr.) at p. 122. Further, Mr. McNair admitted that he had no evidence that the source code files that he relied on to contend ██████████████████████████████████ ████████████████ was even compiled into the firmware running on the Accused Products. *See id.* at p. 124. Accordingly, no reasonable jury could find that ███████████████████████ ████████████████████████

## VI.    THE FAMILY 2 PATENTS ARE NOT INVALID UNDER 35 U.S.C. §§ 102 OR 103

Adtran, through its expert witness, Dr. Zimmerman, failed to provide relevant, clear and convincing evidence upon which a reasonable jury could conclude that the "Asserted F2 Claims" are invalid for anticipation or obviousness pursuant to 35 U.S.C. §§ 102/103. Dr. Zimmerman fails to show that the following claim elements, in combination, are disclosed or obvious:

- "utilizing at least one transmission parameter value to reduce a difference in latency between the bonded transceivers" (881 Patent, claims 17 and 18), which was construed as "utilizing at least one transmission parameter value to reduce a difference in configuration latency between the bonded transceivers" (D.I. 335 at pp. 16-17);

- "utilizing at least one transmission parameter value . . . to reduce a difference in latency between the multiple DSL transceivers" (511 Patent, claim 6), which was construed as "utilizing at least one transmission parameter value . . . to reduce a difference in configuration latency between multiple DSL transceivers" (D.I. 335 at p. 18).

The Patent Trial and Appeal Board ("PTAB") recently addressed Dr. Zimmerman's invalidity opinions directed to the 881 Patent and found that those opinions, and the related *inter partes* review petition, did not demonstrate a reasonable likelihood that claim 17 or claim 18 were anticipated or obvious over many of the same invalidity grounds asserted here. Ex. Q (non-institution decision in IPR2022-00640, dated Sept. 7, 2022), generally. In rejecting Dr. Zimmerman's invalidity grounds, the PTAB recognized the dispositive distinction between

*reducing* a difference in latency, as required by the "utilizing" claim terms recited above, and

*compensating for* a difference in latency.  In particular, the PTAB states:

> As to the first, the "compensating" method, the '881 patent describes:
>
> An exemplary method for dealing with the issue of delay is to have cell buffers (not shown) in the multi-pair multiplexing receiver 500 that can provide the ability to compensate for the variations in delay. [. . .]

Ex. A (881 Patent) at] 6:40–55.

> As to the second, the "reducing" method, the '881 patent describes:
>
> Another effective method of reducing the difference in latency between DSL PHYs is mandate that all DSL PHYs are configured with transmission parameters in order to provide the same configuration latency. [. . .] Alternatively, different PHYs can have, for example, different data rates but use the appropriate coding or interleaving parameters to have the same latency on all the bonded PHYs.

*Id.* at 6:56–65.

> Based on these disclosures, we agree with Patent Owner that the Specification of the '881 patent clearly distinguishes between methods of *compensating for* differences in latency and methods of *reducing* differences in latency. We also agree that the claim is directed to the reducing differences embodiment. [citing case law]
>
> [. . .] we agree with Patent Owner that, in light of the Specification, a person of ordinary skill in the art would have understood that compensating for a difference in latency is not the same as reducing a difference in latency. [citing dictionary]
>
> ***
>
> For these reasons, we determine that the proper construction of the "utilizing" term does not encompass compensating for differences in latency, but is instead directed to reducing a difference in latency between the bonded transceivers, for example by configuring the transceivers with particular transmission parameters.

Ex. Q at pp. 14-18 (emphasis in original).

The PTAB then, under the lower preponderance of evidence standard, found that several

prior art references and combinations asserted by Dr. Zimmerman and Adtran here, did not

disclose or render obvious the "utilizing" term of the 881 Patent (which is materially the same for

purposes of this brief to the "utilizing" term of the 511 Patent).  The PTAB found that Dr.

Zimmerman's opinion that Keller-Tuberg discloses reducing a difference in latency is incorrect;

rather, Keller-Tuberg only discloses compensating for differential delay (or latency) by the use of cell buffers at the receiver. Ex. Q at pp. 28-29. The PTAB also found that the "utilizing" term was not rendered obvious over Keller-Tuber in view of Cooper. Rather, Cooper teaches a specific algorithm to reduce delay on a single link (or transceiver) but is not addressed to reducing a difference in latency between transceivers. *Id.* at pp. 29-31.

The PTAB also found that Dr. Zimmerman's opinion that Counterman selects transmission parameters to reduce a different in latency is incorrect; rather, "[a]s described in Counterman, once the individual links are independently adjusted, Counterman simply groups together the flows that happen to have the same resulting latency. *See* Ex. R (Counterman) at 6:48–7:14. We, thus, find persuasive Patent Owner's argument that in Counterman 'each bonded transceiver utilizes a transmission parameter merely to adjust the latency of individual links to achieve a QoS objective.'" Ex. Q at pp. 31-33. The PTAB also found that the "utilizing" term was not rendered obvious over Counterman in view of Djokovic. Rather, Djokovic merely provides "general teachings of Reed-Solomon FEC coding" but is not addressed to reducing a difference in latency between two or more transceivers. *Id.* at p. 33.

In the present case, Dr. Zimmerman, asserts the following seven §§ 102/103 grounds that overlap with his IPR opinion: anticipation by Counterman; obvious over Counterman and Sathe; obvious over Counterman and Admitted Prior Art; obvious over Counterman and Cooper; obvious over Counterman and Djokovic; obvious over Edvardsen and Djokovic; anticipated by Keller-Tuberg; and obvious over Keller-Tuberg and Djokovic. Ex. S at pp. 127-172 and 187-220 (for 881 Patent) and 221-264 and 278-308 (for 511 Patent). For the grounds including Counterman, Dr. Zimmerman presents the same arguments rejected by the PTAB, arguing incorrectly that the "utilizing" terms are met by grouping links that happen to have the same latency after they have

been individually configured to meet a common "nominal cell transfer delay" "QOS objective." *Id.* at pp. 133-139. The grouping of subsets of links that happen to have the same latency is a way of compensating for the multiple different latencies among the set of links without doing anything to reduce the differences. For the grounds including Keller-Tuberg, Dr. Zimmerman presents the same arguments rejected by the PTAB, arguing incorrectly that the "utilizing" terms are met by the use of receiver queues (i.e., buffers) where slower links are provided shorter queues and faster links receive longer queues. *Id.* at pp. 204-210. The use of different length buffers compensates for a difference in latency without reducing the difference. As for the two grounds asserted by Dr. Zimmerman that include Edvardsen—anticipated by Edvardsen and obvious over Edvardsen and Djokovic—those grounds are incorrect for similar reasons as the Counterman grounds. Dr. Zimmerman asserts that the "utilizing" terms are met by "grouping or bonding lines with the same or similar latency to reduce a difference in latency between the bonded transceivers." *Id.* at 179-180. But the grouping of a subset of lines that happen to have similar latencies is a way of compensating for the multiple different latencies among the set of lines without doing anything to reduce the differences.

For the foregoing reasons, a reasonable jury could not find that Adtran has shown the Asserted F2 Claims to be invalid under 35 U.S.C. §§ 102 or 103.

## VII.    CONCLUSION

For the foregoing reasons, TQ Delta respectfully requests that the Court (1) strike the First and Second Supplemental Zimmerman Reports for Family 2, (2) enter summary judgment that of infringement of the Asserted F7 Claims, and (3) enter summary judgement the Asserted F2 Claims are not invalid for anticipation or obviousness pursuant to 35 U.S.C. §§ 102/103.

Dated: October 14, 2022

Respectfully submitted,

FARNAN LLP

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, Delaware 19801
(302) 777-0300
(302) 777-0301 (Fax)
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Peter J. McAndrews (admitted *pro hac vice*)
Rajendra A. Chiplunkar (admitted *pro hac vice*)
Ashley M. Ratycz (admitted *pro hac vice*)
MCANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, Illinois 60661
(312) 775-8000
(312) 775-8100 (Fax)
pmcandrews@mcandrews-ip.com

*Counsel for Plaintiff TQ Delta, LLC*